WALNUT HILL TELEPHONE COMPANY *v.*
ARKANSAS PUBLIC SERVICE COMMISSION

CA 85-176                                    709 S.W.2d 96

Court of Appeals of Arkansas
En Banc
Opinion delivered April 23, 1986

260

262

*James M. Caplinger, Chartered*, by: *James M. Caplinger* and *James M. Caplinger, Jr.*; and *Prince & Ivester, A Professional Corporation*, by: *Hermann Ivester*, for appellant.

*Lee McCulloch*, for appellee.

LAWSON CLONINGER, Judge. This is an appeal from orders of the Arkansas Public Service Commission dated October 25, 1983, and April 10, 1985, in Commission Docket No. 83-010-U.

On January 17, 1983, Walnut Hill Telephone Company filed with the Commission an application requesting authority to increase its existing rates for intrastate telephone services. The total increase in annual revenues requested in the Company's application was $596,913.00, later reduced to $580,886.00 by amended application.

Pursuant to Ark. Stat. Ann. § 73-217(b) (Supp. 1985), the Company petitioned for an interim rate increase, which the Commission initially denied. On April 27, 1983, the Commission approved an interim increase of $145,321.00 in annual revenues. The case proceeded to full hearing on the merits before the Commission. The parties stipulated that Walnut Hill's rate base was $6,021,879.00. The Commission awarded the Company an overall rate of return on that rate base of 11.68%. One unique aspect of the method employed to derive that return is that, instead of utilizing the Company's actual capital structure, which is 13.8% common equity and just over 85% long-term debt, the PSC used a hypothetical capital structure suggested by the Company consisting of 51% long-term debt, 41% common equity, and the remainder in preferred stock and customer deposits. Utilizing the upper end of the PSC staff's common equity cost calculation and the Company's hypothetical capital structure, Walnut Hill's overall rate of return was derived as follows:

| Capital Component | Capitalization Ratio | Cost | Weighted Cost |
|---|---|---|---|
| Long-term Debt | 51.00% | 11.14% | 5.68% |
| Preferred Stock | 7.90% | 6.00% | .47% |
| Common Equity | 41.00% | 13.30% | 5.45% |
| Customer Deposits | .10% | 6.00% | .01% |
| Totals | 100.00% | | 11.68% |

The Company's required earnings on its rate base were calculated to be $703,355.00. Based upon the Commission's calculation of test year net operating income of $646,596.00, the Commission found that the Company had a gross revenue deficiency of $112,540.00 and an overall revenue requirement of $1,639,949.00.

On October 25, 1983, the Commission issued Order No. 9 denying the Company's requested increase of $580,886.00 and rejecting the PSC staff's recommendation of an increase of $74,331.00, but approving an annual rate increase of $112,540.00. Following a rehearing, the Commission issued Order No. 18 affirming the findings of Order No. 9. Walnut Hill brings this appeal from Orders 9 and 18.

Our review of this matter is limited and is governed by Ark. Stat. Ann. § 73-229.1 (Repl. 1979), which states:

> The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive. The review shall not be extended further than to determine whether the Commission's findings are so supported by substantial evidence, and whether the Commission has regularly pursued its authority, including a determination of whether the order or decision under review violated any right of the petitioner under the laws or Constitution of the United States or of the State of Arkansas.

Therefore, this court can only determine whether: (1) the Commission's findings as to the facts are supported by substantial evidence; (2) the Commission has regularly pursued its authority; and (3) the order or decision under review violated any right of the petitioner under the laws or constitutions of the United States or the State of Arkansas. *Southwestern Bell Telephone Co. v.*

*Arkansas Public Service Commission,* 267 Ark. 550, 593 S.W.2d 434 (1980). In reviewing an order of the Public Service Commission, the court may not pass upon the wisdom of the Commission's actions or say whether the Commission has appropriately exercised its discretion; however, it is for the court to say whether there has been an abuse of discretion, even though considerable judicial restraint should be observed in finding such abuse. *Russellville Water Co.* v. *Arkansas Public Service Commission,* 270 Ark. 584, 606 S.W.2d 552 (1980). This court on appeal is not concerned with the methodology used by the Commission in arriving at the result as long as its finding is based on substantial evidence. *General Telephone Co.* v. *Arkansas Public Service Commission,* 272 Ark. 440, 616 S.W.2d 1 (1981). The court must determine whether the Commission's order violates appellant's constitutional rights by fixing a rate which is so low as to amount to confiscation of its property. *Arkansas Public Service Commission* v. *Continental Telephone Co.,* 262 Ark. 821, 561 S.W.2d 645 (1978); *City of Fort Smith* v. *Southwestern Bell Telephone Co.,* 220 Ark. 70, 247 S.W.2d 474 (1952). The result reached in utility rate cases, not the method employed, controls; and judicial inquiry is concluded if the decision is supported by substantial evidence and the total effect of the rate order is not unjust, unreasonable, unlawful or discriminatory. *Southwestern Bell, supra; Arkansas Public Service Commission* v. *Lincoln-Desha Telephone Co.,* 271 Ark. 346, 609 S.W.2d 20 (1980).

In *Smyth* v. *Ames,* 169 U.S. 466 (1898), the United States Supreme Court established the minimum due process requirements for state regulation of utility rates. In that decision the Court stated that a state's utility commission must first determine the fair value of the property being used by the utility for the convenience of the public. The Court held that after determining a percentage "fair return" on the rate base the commission must calculate a rate schedule that will allow the company to realize revenues sufficient to earn that fair return. However, *Smyth* gave little guidance to state utility commissions on the difficult question of what factors should be considered in computing the rate base or, important to the case before us, in establishing a fair return.

In 1923, the Supreme Court enumerated a number of

factors regulatory commissions should consider in determining a rate of return. In general, the Court found that a utility was entitled to a return "equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties . . . ." *Bluefield Water Works & Improvement Co.* v. *Public Service Commission of West Virginia*, 262 U.S. 679, 692 (1923). These guidelines were refined in *Federal Power Commission* v. *Hope Natural Gas Co.*, 320 U.S. 591 (1944). Significantly, the standard of regional or geographical comparisons set out in *Bluefield* was omitted, and the Court stated that comparisons should be made with other companies having corresponding risks. In so doing, the Court stated:

> From the investor or company point of view it is important that there be enough revenue not only for operating expenses but also for the capital costs of the business. These include service on the debt and dividends on the stock. [citation omitted] By that standard the return to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks. That return, moreover, should be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital. [citation omitted] The conditions under which more or less might be allowed are not important here. Nor is it important to this case to determine the various permissible ways in which any rate base on which the return is computed might be arrived at. For we are of the view that the end result in this case cannot be condemned under the Act as unjust and unreasonable from the investor or company viewpoint.

*Hope, supra*, at 603.

On January 28, 1982, Walnut Hill entered into a Telephone Loan Contract with the Rural Electrification Administration ("REA") and the Rural Telephone Bank ("RTB"), the latter being a federal agency providing financing for rural telephone companies under the direction of the REA. The loan contract enabled Walnut Hill to refinance existing indebtedness, which carried with it interest rates in excess of twenty percent, at more

reasonable rates in the eleven percent range. The loans also have enabled the Company to commence or complete much-needed improvements in service.

One specific provision of the loan contract has given rise to the controversy addressed by the first point of appellant's brief, specifically section 4.16, which reads as follows:

> *Obligation to Seek Recommended Tariff.* The Borrower shall, as soon as possible after the construction of any major portion of the facilities financed by the Loan is completed, or sooner, if requested by the Administrator, (a) seek and use its diligent best efforts to obtain all necessary regulatory body approvals for a tariff which (1) will provide for all one-party service, (2) does not include mileage or zone charges, and (3) is designed to produce net income or margins before interest at least equal to 150 per centum of the interest requirements on all of the Borrower's outstanding and proposed loans, and (b) to place such tariff into effect as soon as permitted by applicable laws and regulations.

Walnut Hill contends, for its first point for reversal, that subsection (a)(3) requires that the Commission set rates sufficient to produce a times interest earned ratio ("TIER") of at least 1.5. Simply put, a TIER is an indicator of a borrower's ability to meet interest expenses. A TIER is a measure of interest coverage reflective of how many times interest obligations are covered by funds available to pay that interest. Therefore, a company with a TIER of 1.0 theoretically has earnings sufficient to meet its interest expenses and nothing more. It follows that the higher a company's TIER, the better able it is to meet its obligations. Walnut Hill requested that the Commission set rates sufficient to produce a TIER of 1.75, and contends that the Commission was bound by the aforementioned provision of the loan contract between Walnut Hill and the REA to set rates sufficient to produce a TIER of at least 1.5. The Commission refused to set rates designed to accomplish any specific TIER and rejected the argument that the Commission was legally bound to set rates because of the terms of section 4.16 of the loan contract.

Both the Company and the Commission agree that use of a TIER as a rate-making device is virtually unprecedented

in the case of an investor-owned utility. The testimony tended to show, and our research indicates, that use of a TIER by which rates may be set is most common in the cases of cooperative associations, which are by definition owned by their rate-payers and to whose benefit any excess revenues recovered through rates would accrue. It is notable that the parties agree that rates producing a TIER of 1.5 for Walnut Hill would yield a return on equity to Company stockholders of 51.5%. The record reflects that a TIER is simply one aspect of a utility company's financial health and does not take into account all aspects of a company's costs of delivering utility service to its customers. Use of a TIER as a ratemaking tool is not a common practice in cases of investor-owned utilities, and any method used to set rates should account for all aspects of a public utility's costs of delivering utility service to its customers. The Public Service Commission has wide discretion in choosing its approach to rate regulation, and the PSC is not bound to any particular formula. *Southwestern Bell, supra*. We cannot say that the Commission's refusal to set rates based on a TIER, or designed to yield a TIER of at least 1.5 as requested by the Company, was arbitrary, unreasonable, or unsupported by substantial evidence.

Walnut Hill also contends that the Commission is pre-empted in this matter by both federal and state law. We do not agree.

In support of its position that the PSC is bound to set rates based on the contract between the Company and the REA, Walnut Hill relies on Ark. Stat. Ann. § 73-202.2 (Supp. 1985), which provides in pertinent part as follows:

> Jurisdiction of the said Commission shall not extend to loans made or guaranteed by the Rural Electrification Administration of the United States Department of Agriculture, the Federal Financing Bank, or such other agency or instrumentality as may be established by the United States Government for these purposes. . . .

Walnut Hill cites the following language from 7 U.S.C. § 948(b)(4) (1976) in further support of its position:

> Loans shall not be made under this section unless the Governor [the administrator of REA] of the telephone

bank finds and certifies that in his judgment . . . the borrower has the capability of producing net income or margins before interest at least equal to 150 per centum of the outstanding interest requirements on all of its outstanding and proposed loans, or such higher per centum as may be fixed from time to time by the Telephone Bank Board. . . .

A fair reading of Section 4.16 of the loan contract is that Walnut Hill simply obligated itself to *seek* rates designed to achieve a TIER of 1.5. The evidence shows that, in the view of the REA, the Company had fulfilled its obligation. We cannot say that the Commission was in any manner attempting to exercise jurisdiction over the loan agreement in question. Instead, the record is clear that the PSC was not dictating the terms, conditions, or performance of any party to the contract. We cannot read Ark. Stat. Ann. § 73-202.2 (Supp. 1985) as broadly as urged by Walnut Hill; were the Company's view of 73-202.2 correct, any utility could, by simply contracting with the REA, divest the PSC of control over utility rates.

Neither are we persuaded that 7 U.S.C. § 948(b)(4) mandates that the PSC set rates based upon a contract between an Arkansas utility and an agency of the federal government. The language of the Act speaks of the RTB's assessment of the borrower's *ability to achieve* a 1.5 TIER. In refusing to utilize a TIER as a method by which to set rates, the Commission was not interfering with Walnut Hill's relationship with the Federal agency. Bryan Howerton, a spokesman for the governor or administrator of the REA, testified that, in the view of that agency, Walnut Hill had fulfilled its contractual obligation to the agency.[1] While the governor of the Telephone Bank may not advance funds at some time in the future to Walnut Hill, the record does not demonstrate that he will not because of a perceived inability on the part of the Company to achieve an acceptable TIER. The evidence does not demonstrate that the Company's access to REA funds will be foreclosed unless the Commission sets rates specifically designed to achieve a TIER of

---

[1] Howerton testified that the governor of the RTB and the administrator of the REA are the same person.

at least 1.5. Moreover, we do not see that the Commission's refusal to set rates specifically designed to allow the Company to achieve a TIER of 1.5 renders the Company incapable of achieving that TIER.

Walnut Hill's second point for reversal is that the rate of return authorized by the PSC is unreasonable, confiscatory, arbitrary, and not based upon substantial evidence or sufficient findings of fact. Specifically, the Company objects to the return on the equity component of the overall rate of return as being too low and not reflective of Walnut Hill's peculiar circumstances. The Company argues that, if a TIER is deemed inappropriate as a means by which its rates should be set, the application of a more traditional rate-making formula by the Commission would also be inappropriate.

The Commission adopted the rate of return methodology proposed by staff, which is known as the weighted cost of capital approach. In this methodology, the various components of a company's capital structure (here, long-term debt, preferred stock, common equity, and customer deposits) are weighted as to their costs with respect to their relative proportions in the total capital structure and then added together to obtain an overall cost figure for the entire capital structure. The Company's actual capital structure is not in dispute. Both the staff and the Company agree on the cost of all elements of the capital structure except the common equity component. The Commission set the return on equity at 13.3%, the high end of a range suggested by staff witness Joseph Chrisman.

Chrisman arrived at his return on common equity recommendation by use of what is known as the "discounted cash flow" ("DCF") model, which attempts to derive an allowable return on equity based upon an estimate of investors' expectations.[2] The DCF formula involves a mathematical computation which takes into account current dividends per share, current market price per share, and the expected growth rate in dividends per share;

---

[2] The DCF model is mathematically expressed as follows: $K = (D/P) + g$, where "K" is the investors' required rate of return (cost of equity), "D" is the expected dividend, "P" is the current market price of the stock, and "g" equals investors' long-term growth expectation.

the result is a percentage figure representing the required return on equity for the particular utility under consideration.

The DCF formula depends on market information for its application. This presents a problem with companies such as Walnut Hill, whose stock is not market-traded. Common regulatory practice in situations such as this is to utilize information from other market-traded companies engaging in the same type of utility business as a model or proxy. It is the execution of this practice in these circumstances about which Walnut Hill complains.

The staff witness utilized eight large, market-traded companies, none of which provide telephone utility service in Arkansas.[3] Utilizing information from financial publications, the staff witness suggested that the Commission allow Walnut Hill a return on equity of 13.1%, which was the midpoint of a range derived from the eight market-traded companies' returns of 12.92% to 13.3%. The PSC made a finding of fact that Walnut Hill is "more risky than some but less risky than none" of the proxy companies and, based on that determination, set Walnut Hill's return on equity at the top end of the range derived from the calculation.

The Company contends that the adoption by the PSC of the top end of the staff's suggested return on equity range is not justified, pointing out that there are wide disparities between Walnut Hill and the eight market-traded companies from which witness Chrisman derived his return on equity component. The Company contends that the common equity cost component should be 17.25%, as suggested by its witness, Dr. Kenneth Hubbell. Use of this figure instead of the 13.3% figure employed by the Commission would result in a calculation of Walnut Hill's overall rate of return to be 13.23% rather than the 11.68% allowed by the Commission. Company witness Hubbell, however, presented very little data justifying his suggested return on equity, but instead stated simply that his figure was based on his perception of Walnut Hill's risk position.

---

[3]   The companies were: Bell Canada, Cincinnati Bell, Continental Telephone, GTE, Mid-Continent Telephone, Rochester Telephone, Southern New England Telephone, and United Telecommunications.

Walnut Hill forcefully argues that other Arkansas companies similarly situated to Walnut Hill should be utilized in determining Walnut Hill's return on equity, and it presented in its post-hearing brief to the Commission a list of eight small investor-owned utilities in Arkansas which are quite similar in many respects to Walnut Hill. However, there is no evidence that these companies' stocks are market-traded or that there are any market data available for them. Likewise, there is no evidence in the record as to which particular methodology was utilized in determining those companies' returns on equity or whether those figures listed by Walnut Hill were simply calculated or were actually awarded by the PSC. For these reasons alone, the Commission did not err in declining to utilize the evidence offered by Walnut Hill to determine the Company's rate of return. The methodology as utilized in this case is appropriate under the circumstances, and we cannot say that the result it yields is confiscatory, because the orders provided for rates designed to produce sufficient revenues to cover debt service, meet legitimate operating expenses, and provide a return on the shareholders' investment.

Following the principles set forth in the *Smyth, Bluefield*, and *Hope* decisions, the primary objective in ratemaking is to set rates so that the utility will be able to meet its legitimate operating expenses as well as to pay creditors and provide dividends to shareholders. The utility's return should be sufficient to maintain its financial integrity so that it might attract new capital. *Hope, supra.* There is substantial evidence in the record before us that this primary objective was met in this case.

In its third point, the Company correctly directs our attention to the fact that the Commission utilized an erroneous intrastate income tax expense in calculating the revenue requirement. The Commission concedes that an erroneous calculation was utilized, and the Commission agrees that the correct tax expense calculation is that urged by the Company. We therefore modify, pursuant to Ark. Stat. Ann. § 73-229.1(b) (Supp. 1985), the revenue requirement calculation as follows to include an allowance for the correct income tax expense:

| Description | Corrected Amounts |
|---|---|
| Total Rate Base | $6,021,879 |
| Operating Revenues | 1,527,409 |
| Operating Expenses | 894,180 |
| Net Operating Income | $ 633,229 |
| Required Return on Rate Base | 11.68% |
| Required Earnings on Rate Base | 703,355 |
| Earnings Deficiency | 70,126 |
| Gross Revenue Conversion Factor | 1.98275 |
| Gross Revenue Deficiency | 139,042 |
| Revenue Requirement | 1,666,451 |

The Arkansas Public Service Commission shall permit Walnut Hill Telephone Company to file tariffs reflecting rates designed to produce revenues of $1,666,451.00.

Finally, the Company urges that, because a hypothetical capital structure was utilized, a "synchronizing" hypothetical income tax expense adjustment should be made. As noted previously, the Commission adopted a hypothetical capital structure for calculating revenues for Walnut Hill. The use of a hypothetical capital structure was found by the Commission to be reasonable "[i]n order to blunt the revenue impact of the Company's massive borrowing." The practical effect of this action is to generate a portion of the overall rate of return by imputing a larger common equity component (which is higher in cost than debt) into the weighted cost of capital calculation. In turn, this raises the overall cost of capital (and hence the overall rate of return) from 11.39%, utilizing the actual capital structure, to 11.68% with the hypothetical structure. As stated by the Commission, one reason for this action was to "provide incentive for the Company to restructure its capital sources to increase the amount of equity."

The record reflects that a hypothetical capital structure is normally utilized in instances where a company has a relatively low ratio of debt to equity, with a hypothetical interest expense being included in the revenue requirement calculation. Since debt is generally lower in cost than equity and carries with it the benefit

of lowering income tax expense (because interest expense is deductible), this action arbitrarily lowers the amount of income tax expense which must be borne by ratepayers. The actual tax still must be paid by the company; however, it is not recognized as a recoverable expense. Here, the reverse is true: a hypothetical capital structure was utilized to benefit the Company by artificially increasing the amount of revenues recoverable from consumers by overstatement of the equity component of the Company's capital structure. The hypothetical overstatement of the equity component results in the hypothetical understatement of the debt component of the capital structure. The resulting hypothetical understatement of interest expense would increase the hypothetical tax liability of the Company. The problem arises with regard to the amount of income tax expense to be included in the revenue requirement calculation.

The question is whether a hypothetical lower interest expense should be imputed to Walnut Hill, resulting in a higher hypothetical tax liability, which is in turn included in the revenue requirement recoverable from ratepayers. We think not. The PSC can adjust virtually any expense in setting rates which are just and reasonable for both a utility and its customers. The use of a hypothetical capital structure should not foreclose the Commission's duty to utilize whatever reasonable figures, actual or hypothetical, it deems necessary in appropriately exercising its discretion. The PSC is free, within the ambit of its statutory authority, to make the pragmatic adjustments which may be called for by particular circumstances. *Southwestern Bell, supra*, at 567, citing *Federal Power Commission* v. *Natural Gas Pipeline Co.*, 315 U.S. 575 (1942). This is especially appropriate where, as here, the hypothetical capital structure was used as a tool by which additional revenues could be generated for the benefit of the Company. Walnut Hill's actual low income tax expense, which results from its high interest expense, was properly utilized as a known component of the revenue requirement calculation and is supported by substantial evidence.

The decision of the Commission is modified with respect to utilization of the correct income tax expense in calculating the revenue requirement of the Company, as noted above, and the orders appealed are in all other respects affirmed.

Affirmed as modified.

GLAZE, J., concurring.

CORBIN, J., not participating.

TOM GLAZE, Judge, concurring. As stated in the majority opinion, the United States Supreme Court has given guidance as to the considerations regulatory commissions should take into account when determining a just rate of return for a public utility. *Bluefield Water Works & Improvement Co. v. Public Service Commission of West Virginia*, 262 U.S. 679, 692 (1923); *Federal Power Commission v. Hope Natural Gas Co.*, 320 U.S. 591 (1944). Forty-two years after the *Hope* decision, however, it is unclear whether the *Bluefield* standard that a utility should be given a return generally equal to that being made by similarly risky businesses "in the same general part of the country" remains applicable. As the majority opinion points out, *Hope* did not mention the standard of regional or geographical comparison as a consideration, perhaps because of ambiguities in the *Bluefield* decision.

I am of the opinion that it would be a reasonable and logical consideration for public utilities and the PSC alike to find regional comparables in determining an appropriate return on equity for a public utility. To me, it is an unwieldy approach to utilize companies like those used in this case because they are giants in the telephone industry and are located in distant parts of this country and beyond. Except for the fact that they provide telephone service to the public, those companies share very few similarities with Walnut Hill.

If the *Bluefield* requirement of regional or geographical comparison is the rule today, Walnut Hill makes a good argument that the PSC failed to comply with *Bluefield*. But even if the *Bluefield* standard continues to be one of the factors to be considered, the record before this Court is not sufficient to show the Company met its burden in giving the Commission valid alternatives from which a return on equity could be computed. The Arkansas companies presented by Walnut Hill in its post-hearing brief to the Commission were not shown to be relevant or workable alternatives to those used by the Commission, because the record does not reflect *how* those Arkansas companies'

returns on equity were derived. Logically, it could well be that the same methodology used in the instant case was used when those Arkansas companies' rates were determined. In this respect, the proof falls short in revealing how their returns on equity were calculated by the Commission. Indeed, we cannot be certain from the evidence that those returns were actually awarded by the Commission or simply achieved by those companies through good management economies and efficiencies.

The Arkansas cases cited by the majority are clear as to the limited scope of our inquiry in reviewing a decision of the Public Service Commission. So long as the result achieved is supported by substantial evidence and cannot be said to be unjust, unreasonable, unlawful or discriminatory, or violative of the utility's rights under the laws or Constitutions of the United States or State of Arkansas, judicial inquiry is at an end. *Arkansas Public Service Commission* v. *Lincoln-Desha Telephone Co.,* 271 Ark. 346, 609 S.W.2d 20 (1980); *Southwestern Bell Telephone Co.* v. *Arkansas Public Service Commission,* 267 Ark. 550, 593 S.W.2d 434 (1980). However, even under this limited scope of review, our appellate courts would be bound by U.S. Supreme Court case law that has articulated and established guidelines to follow when, as here, a fair rate of return for a public utility must be determined. Clearly, if the regional or geographical comparison standard of *Bluefield* is still viable, the Commission did not follow it. Nevertheless, Walnut Hill had the burden of offering valid geographical comparisons if such existed and, from my review, the Company failed to do so. As I previously indicated, I am somewhat doubtful concerning whether the regional or geographical comparison standard of *Bluefield* remains viable after the *Hope* decision.[1] While it may be argued that the *Bluefield* geographical standard is no longer required, I believe that standard employs a common sense approach and should be a part of any rate-making consideration whenever possible.

---

[1] At least one writer is of the opinion that the *Hope* decision represents a restatement of the *Bluefield* decision, and he notes specifically that the *Bluefield* standard of regional comparisons was omitted by the U.S. Supreme Court in *Hope*. Charles F. Phillips, Jr., *The Regulation of Public Utilities* (Arlington, Va.: Public Utilities Reports, Inc., 1985), p. 336.