## SOUTHWESTERN BELL TELEPHONE COMPANY v. ARKANSAS PUBLIC SERVICE COMMISSION

CA 85-274 715 S.W.2d 451

Court of Appeals of Arkansas
En Banc
Opinion delivered September 10, 1986

262

264

*D. D. Dupre* and *Gary S. Wann*, and *Friday, Eldredge & Clark*, by: *Herschel Friday* and *Jeff Broadwater*, for appellant.

*Lee McCulloch* and *Art Stuenkel*, for appellee.

GEORGE K. CRACRAFT, Chief Judge. Southwestern Bell Telephone Company brings this appeal from orders of the Arkansas Public Service Commission denying its application for an intrastate rate increase of $60,946,000 but allowing an increase of $23,939,000.

Southwestern Bell contends that the Commission erred in its cost of equity calculation; in refusing to accept "repression adjustments," which attempt to make up for revenues "lost" due to a decrease in consumption of service which occurs as a result of a price increase;[1] in adopting the PSC staff's recommendation as to Yellow Page advertising revenues for the *pro forma* year; and in disallowing for ratemaking purposes a portion of Bell's wage and salary expenses and associated costs on the ground that those expenses exceed the average for comparable positions in this region. We find no error and affirm.

Our review is limited and governed by Ark. Stat. Ann. Section 73-229.1 (Supp. 1985), which states:

> The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive. The review shall not be extended further than to determine whether the Commission's findings are so supported by substantial evidence, and whether the Commission has regularly pursued its authority, including a determination of whether the order or decision under review violated any right of the petition[er] under the laws or Constitution of the United States or of the State of Arkansas.

---

[1] A change in consumption in response to a change in price is an economic phenomenon sometimes referred to as "elasticity of demand."

Our duty, therefore, is to determine whether (1) the Commission's findings as to the facts are supported by substantial evidence; (2) the Commission has regularly pursued its authority; and (3) the order or decision under review violated any right of Southwestern Bell under the laws or Constitutions of the United States or State of Arkansas. *Southwestern Bell Telephone Co. v. Arkansas Public Service Commission*, 267 Ark. 550, 593 S.W.2d 434 (1980); *Walnut Hill Telephone Co. v. Arkansas Public Service Commission*, 17 Ark. App. 259, 709 S.W.2d 96 (1986).

On appeal, we must give due regard to the limitations on the scope of judicial review and to the expertise of the Commission. We may not pass upon the wisdom of the Commission's actions and must defer to the expertise of the Commission, which derives its ratemaking authority from the Arkansas General Assembly. However, judicial review is not a mere formality, and it is our task to determine whether there has been an arbitrary or unwarranted abuse of the Commission's discretion, although considerable judicial restraint should be observed in finding such an abuse. It is not for this court to advise the Commission how to discharge its functions in arriving at findings of fact or in exercising its discretion. The question of reasonableness of the actions of the Commission relates only to its findings of fact and to a determination of whether its actions were arbitrary. *Southwestern Bell, supra.*

The Commission is free, within the ambit of its statutory authority, to make the pragmatic adjustments which may be called for by particular circumstances. No public utility has a vested right to any particular method of valuation or rate of return. The Commission has wide discretion in choosing its approach to rate regulation. This court on appeal is generally not concerned with the methodology used by the Commission in arriving at a result as long as its findings are based on substantial evidence. In utility rate cases, it is the result reached, not the method employed, which controls; and judicial inquiry is concluded if the decision is supported by substantial evidence and the total effect of the rate order is not unjust, unreasonable, unlawful or discriminatory. *Federal Power Commission v. Hope Natural Gas Co.*, 320 U.S. 591 (1944); *General Telephone v. Arkansas Public Service Commission*, 272 Ark. 440, 616 S.W.2d 1 (1981);

*Arkansas Public Service Commission* v. *Lincoln-Desha Telephone Co.*, 271 Ark. 346, 609 S.W.2d 20 (1980); *Southwestern Bell, supra; Walnut Hill, supra.* It is not the theory, but the impact, of the rate order that counts in determining whether rates are just, reasonable, lawful, and non-discriminatory under Ark. Stat. Ann. Section 73-217 (Supp. 1985). If the total effect of the rate order cannot be said to be unjust, unreasonable, unlawful or discriminatory, judicial inquiry is concluded, and infirmities in the method employed are rendered unimportant. *Hope, supra; Southwestern Bell, supra; Walnut Hill, supra.* Guided by these considerations with regard to our standard of review, we address Bell's points on appeal.

First, Bell argues that the rate of return authorized by the Commission is arbitrary, capricious, unreasonable and not based upon substantial evidence or sufficient findings of fact. Specifically, Bell complains that the Commission incorrectly applied the Discounted Cash Flow (DCF) formula in calculating Bell's cost of equity and that the Commission should have utilized a newly-declared dividend rather than a historical dividend in applying the DCF formula. We do not agree.

A utility's overall rate of return is calculated by use of the "weighted cost of capital" approach. In this method, the various components of a company's capital structure are weighted as to cost with respect to each component's relative proportion in the total capital structure and then added together to obtain the overall cost of the capital structure. Of the several elements which go into calculating Bell's weighted cost of capital, only the cost of equity component is in dispute here. Bell's requested 11.16% overall rate of return on its rate base of $731,866,000 was calculated using a 16% cost of equity. PSC staff witness Donna Kilburn recommended that a cost of equity of 13.75% be used. The Attorney General of Arkansas sponsored a witness who calculated Bell's cost of equity to be 14.02%. After considering the testimony presented, the Commission utilized a cost of equity of 13.5% in its cost of capital calculation which results in an overall rate of return of 9.98%.[2]

---

[2] This includes an adjustment to reflect 14.81% of Arkansas interstate rate base attributable to Investment Tax Credits and Accumulated Deferred Income Taxes.

■ All the witnesses, as well as the Commission, utilized the DCF methodology to calculate Bell's cost of equity.[3] This mathematical formula takes into account dividends per share, market price per share, and the expected growth rate in dividends per share. The result is a percentage figure representing the required return on equity for the particular utility under consideration. The DCF formula is designed to derive an allowable return on equity based upon an estimate of investors' expectations.

■ Both Kilburn and Bell's witness, Michael Kaufman, testified that the components of the DCF formula must be contemporaneous, which we understand to mean that the elements of price, dividend, and growth should be representative of the same point or period in time. The premise of this theory is that investors decide to purchase stock based on considerations which include dividend and growth expectations for the future. Bell argues that the Commission has arbitrarily mismatched yield (D/P) and growth (g) components of the formula from different time periods to understate the cost of equity. While we have neither been cited to nor have we found any cases or other authority for the proposition that the elements utilized in a DCF calculation must be contemporaneous, common sense and logic would indicate that the elements should be contemporaneous (that is, synchronized as to time).

■ Kaufman and Kilburn both utilized an annualized dividend (d) of $5.60 based on historical data. Attorney General witness Richard Wilson used a range of $5.60 to $6.00 and testified that *Value Line* (a financial publication utilized by the investment community) had predicted that the dividend would probably go to $6.00. With regard to the $5.60 historical dividend used by the Commission in its DCF calculation, we cannot say that its use is not supported by substantial evidence. All the expert witnesses suggested the historical annualized dividend in their DCF calculations, and the Commission noted in its final order its

---

[3] The DCF model is mathematically expressed as follows: $K = (D/P) + g$, where "K" is the investors' required rate of return (cost of equity), "D" is the expected dividend, "P" is the current market price of the stock, and "g" equals investors' long-term growth expectation.

preference for a historical dividend.

Bell contends that the Commission's refusal to utilize in its DCF calculation a $6.00 annualized dividend declared after hearings were held (but of which the Commission took administrative notice in its final order) violates Ark. Stat. Ann. Section 73-217.5 (Supp. 1985). That statute specifies what test period may be used by a utility and further says that "the Commission shall also *permit* adjustments to any test year so utilized to reflect the effects on an annualized basis of any and all changes in circumstances which may occur within 12 months after the end of such test year where such changes are both reasonably known and measurable [emphasis added]." We note that the statute does not require the Commission to make such adjustments but only requires that the utility be permitted to adjust its test period data to reflect reasonably known and measurable changes which may occur within twelve months of the end of the test year. The evidence does not reflect that Bell attempted to make such an adjustment to its test period. Indeed, Bell's witness Kaufman used a $5.60 annualized dividend in his calculation, as did the other experts.

We are of the opinion that the Commission should not venture outside the record before it and take administrative notice of facts or events for use in setting rates except in the most unusual of circumstances. Likewise, we do not think it advisable for utilities to expect this of the Commission. The process of setting utility rates is imprecise at its very best, and the use of information outside the record would generally add to the imperfections of the process. It seems logical that a point or period in time must be fixed during the ratemaking process at which the interjection of variables must cease and rate calculations committed to paper. Only then can there be an element of certainty in this often uncertain process.

The various expert witnesses presented considerable evidence suggesting a price (P) component in the DCF formula of anywhere from the mid-$50 range to $68.50. This range represents the price of Bell's stock during the period from April, 1984, to December, 1984. The Commission adopted a price range of $68.50 to $74.75. Kaufman testified on cross-examination that Bell's stock had closed on February 19, 1985 at $74.75; however,

he did not suggest that this price be used in the DCF calculation here (and carefully stated that he did not sponsor that price).

The growth (g) component in the various witnesses' DCF calculations has also given rise to controversy in this case. This element attempts to approximate the investor-expected sustainable dividend growth rate. All the expert witnesses apparently used what is known as the "br" approach to calculate the growth component of the DCF formula. The "b" component is the expected retention ratio.[4] All the experts and the Commission agreed this component to be between .35 and .40 and utilized something in that range. The "r" component is the expected return on equity anticipated by investors. However, it is not necessarily the same as the return on equity allowed the utility by a regulatory agency. The expert witnesses presented evidence that "r" should be anywhere from 12.5% to 15%, with a resulting "g" or growth factor anywhere from 4.05% to 7%. In calculating the cost of equity, the Commission used a price range of $68.50 to $74.75 and a dividend of $5.60.

The pairing of the $74.75 price from February, 1985, with the $5.60 dividend from the 1984 time period, along with the growth component from the middle of 1984 and an adjustment for flotation, results in a cost of equity figure of 11.905%, which is the lower end of the Commission's range. The use of the $68.50 price in the DCF calculation results in a cost of equity at the top of the Commission's range (13.41%). It is from the 13.41% that the Commission "rounded" the return on equity up to the 13.5% awarded Bell.

While the Commission's application of the DCF formula is afflicted with logical inconsistencies, we cannot say that the result it yields is unjust or that appellant has shown such a clear abuse of discretion that overturning the Commission's action is warranted. We feel in this case much as the Arkansas Supreme Court did when it stated in *Southwestern Bell, supra* at 566-67, 593 S.W.2d at 444-45:

---

[4] A retention ratio is reflective of that portion of earnings over and above operating costs which is retained by the company as opposed to the remainder of those net earnings which is paid out to stockholders in the form of dividends.

We have been troubled by the apparent inconsistency in PSC's approval of different methods of accounting and different methods of computation of rates of return on different occasions, fully recognizing that it may be quite difficult to establish hard and fast rules to be utilized and followed in determining a fair rate of return but, at the same time, thinking that a more uniform application of established and predictable criteria would lead to fairer and more understandable results. *Arkansas Power & Light Co.* v. *Arkansas Public Service Com'n.*, 261 Ark. 184, 546 S.W.2d 720. While we understand appellant's bewilderment, neither it, nor our concern, can be translated into a judicial mandate requiring the commission to take the same approach to every rate application, or even to consecutive applications by the same utility, when the commission, in its expertise, determines that its previous methods are unsound or inappropriate to the particular application.

In its second point for reversal, Southwestern Bell argues that the Commission acted arbitrarily, capriciously and unreasonably in rejecting Bell's repression adjustments. The concept of repression is based on the theory that, as the price of a service increases, the quantity of the service demanded decreases, and is usually accompanied by a decrease in revenues realized from the sale of the service. Bell argues that, when the price of a service is raised, failure to account for repression in estimating actual revenues that will be attained may result in an overstatement of projected revenues. Bell presented testimony providing repression figures for certain coin telephone, operator, and message telecommunications services for which rates were increased. The Commission acknowledged that the phenomenon of repression occurs and is "known," but concluded that the evidence did not possess a degree of accuracy sufficient to satisfy the "measurable" standard of Section 73-217.5.

Known and measurable adjustments which affect test-year data are proper if they can be determined with certainty. *Mountain States Telephone & Telegraph Co.* v. *Public Service Commission*, 698 P.2d 627 (Wyo. 1985). The Commission found that, while it is fairly certain that repression occurs (i.e., it is "known"), the evidence presented did not demonstrate that

repression's effects could be measured with the degree of accuracy required by statute to qualify as both a reasonably "known" and "measurable" change. The Commission noted that the calculations used by Bell to prove coin telephone repression do not take into account the expense savings associated with a decline in calling volumes, nor did they account for a number of other factors, including "overpays," which could affect the level of revenues recovered. We also note that the repression estimates presented by Bell were based on an anticipated increase from $.10 to $.25 per local coin call. The Commission granted an increase to only $.20; therefore, the repression demand model submitted by Bell does not apply since coin phone rates were not raised to the higher amount upon which its estimates were based.

 Evidence was also presented concerning demand repression in the area of operator services and message telecommunications services. The proposed adjustments were based on studies done in Bell's service territory,[5] which attempted to measure the drop in consumers' demand for these services when the charges were imposed or increased. However, these proposals were based on the assumption that consumers in other states are directly representative of Bell's customers in Arkansas. The Commission again found that, while the theory of repression is "known," its effects cannot be measured with the degree of accuracy required by Section 73-217.5 to qualify as both a reasonably known *and* measurable change and that other states' consumers are not necessarily representative of Arkansas consumers. We cannot say that this finding is not supported by substantial evidence.

We cannot say from our review of the record that the refusal of the Commission to accept Bell's repression adjustments is erroneous. The Commission's finding that Bell's evidence on demand repression did not meet the reasonably known and measurable standard of Section 73-217.5 was not arbitrary and capricious, is supported by substantial evidence, and is therefore affirmed.

Bell also takes issue with the Commission's approach to a *pro*

---

[5] Bell's service territory includes, in addition to Arkansas, the states of Texas, Oklahoma, Missouri and Kansas.

*forma* adjustment proposed by staff witness Rodney Merritt to impute to Bell the revenues and expenses associated with Yellow Page operations of a related company for both the test year and the *pro forma* year. Bell did not dispute the imputation of test year expenses and revenues; however, it did contend that inclusion of the *pro forma* year revenue and expense increases was improper. The result was a projected net revenue increase of $906,350.00 attributable to the Yellow Page adjustment which the Commission's revenue requirement calculation took into account. This adjustment was based on figures which were computed by Bell itself, taking into account an estimated price increase in Yellow Page advertising rates and offsetting those additional revenues with increased expenses associated with Yellow Page advertising.

Bell objected to this adjustment, contending it was not reasonably known and measurable, claiming it would depend on the level of advertising purchased by Yellow Page customers as well as other factors including customers' perceptions of the effectiveness of the advertising, the growth of competition, the general state of the economy, interest rates, and tax changes affecting disposable income. However, the Commission found that this adjustment was based on reliable data supplied by Bell and found it to be reasonably known and measurable within the guidelines of the statute. We cannot say from our review of the record that the finding was not supported by substantial evidence. Bell contends that the Commission inconsistently applies the "known and measurable" standard in finding, on the one hand, the *pro forma* Yellow Page adjustment to meet the standard while, on the other hand, finding Bell's repression estimates for coin, operator, and other services to fall short of that standard. We do not agree, and note that any proposed adjustment stands alone when measured by the "known and measurable" standard of Section 73-217.5.

Finally, Bell complains of adjustments made by the Commission to certain wage and salary expenses negotiated between Bell and the Communications Workers of America pursuant to the provisions of the National Labor Relations Act (NLRA). Aside from the contention that the Commission erred in the manner in which these adjustments were made, Bell also claims that the NLRA has so occupied the field of wage and

salary contracts that the Commission is pre-empted, and therefore prohibited, by federal law from making these adjustments. Although we are aware that this issue has been litigated in the United States District Court for the Eastern District of Arkansas, and that it has ruled that the NLRA prohibits the Commission from making wage and salary adjustments in this case,[6] we do not agree that the NLRA sweeps so broadly as to displace the Arkansas Commission's ability to establish reasonable utility rates. It seems to us that state regulation of intrastate monopoly telephone service must be permitted with regard to all of a utility's expenses, including wages and salaries, because utility service concerns "interests deeply rooted in local feeling and responsibility." *Belknap, Inc.* v. *Hale*, 463 U.S. 491 (1983). We do not believe that Congress intended the NLRA to intrude into state utility regulation, and appellant has not presented us with any evidence of such congressional intent.

We now turn to Bell's argument that the Commission's disallowance of wage, salary and related costs was arbitrary, capricious, unreasonable and not supported by substantial evidence or based on sufficient findings of fact, as outlined in Bell's points IV and VI for reversal. We find Bell's arguments to be without merit and affirm.

The Commission disallowed that portion of certain wage, salary and related expenses which exceeded 110% of the regional average for comparable positions. The Commission rejected a proposed adjustment for positions which it found to be part of a national, rather than regional, labor pool. Bell contends it should be allowed to recover all actual wage, salary and related expenses. We agree with the proposition that this type of expense is a basic part of the cost of providing utility service, and that recognition of all or a good portion of such costs in setting rates is usually proper. Bell notes in its brief that there may be circumstances in which a Commission could do exactly what it did here, and we find that such circumstances indeed exist in this particular case. We do not agree with Bell's contention that a specific finding of bad faith or imprudence by the Commission is a necessary

---

[6] *Southwestern Bell Tel. Co.* v. *Arkansas Public Service Comm'n., et al.*, No. LR-C-85-832, ___ F. Supp. ___ (E.D. Ark. July 18, 1986).

predicate to disallowance of a portion of these costs. The Commission had before it a considerable volume of evidence and had the benefit of detailed analyses conducted by large, reputable consulting firms for both Bell and the PSC staff on these issues. The disallowance of a portion of wage and salary expenses by the Commission carries with it the implication that these expenses, in the judgment of the Commission, were not reasonably necessary for providing adequate telephone service to ratepayers.

Disallowance of some of these costs by the Commission does not interfere with the exercise of management judgment by Bell, and management remains unfettered as to how it conducts its affairs. Instead, it is the impact that conduct may have on rates with which the Commission must remain free to concern itself within the limits of its authority. It is the reasonableness of the costs, and not the attitude or wisdom with which those costs were incurred by management, as to which the Commission must exercise its judgment. This is the true test to be applied by the Commission in scrutinizing expenses to be charged to consumers.

Here, the Commission had a wealth of expert evidence before it from which it could reasonably conclude that some of Bell's wage and salary expenses (with accompanying fringe benefits and taxes) substantially exceeded the average for comparable positions in this region. That evidence is substantial, and we cannot say that the Commission's findings of fact thereon are erroneous or arbitrary, capricious or unreasonable.

Bell finally argues that the Commission erred in failing to evaluate wage and salary expenses in the context of its collective bargaining agreement. This argument is without merit and merely constitutes a restatement of Bell's primary disagreement with the expense adjustment. Our review of the Commission's order does not reveal whether the Commission did or did not consider the universe of factors which come to bear on the end result of the collective bargaining process, but that is not our concern on appeal. We have already found the Commission's action to be supported by substantial evidence, and we need not inquire further into what the Commission may not have considered in making its decision.

The decision of the Public Service Commission is affirmed in

all respects.

COOPER, J., concurs.

GLAZE, J., concurs, but dissents, however, regarding the preemption issue.

CORBIN, J., not participating.

JAMES R. COOPER, Judge, concurring. In *Southwestern Bell Tel. Co.* v. *Arkansas Public Service Commission, et al.*, No. LR-C-85-832, ___ F. Supp. ___ (E.D. Ark. July 18, 1986), the court issued a declaratory judgment that the Commission has "no authority over the wage rates and other related benefits negotiated in interstate commerce." [Opinion, p. 9] I do not agree that the District Court correctly decided this issue, and, while the majority opinion so holds, I concur to further explain my basis for believing that the District Court was in error.

In the case at bar, the Commission did not attempt to exercise any authority over wage rates and related benefits; instead, it set reasonable rates for intrastate telephone service which incidentally involved the exercise of judgment as to the reasonable wage expenses which were to be recovered from consumers. The Commission did not dictate wage rates nor did it attempt to modify those wage rates which had been negotiated under the National Labor Relations Act. Rather, it specified that the major portion of wage rates would be recoverable from consumers and a small portion of them would not.

I cannot agree that the federal scheme of regulation goes nearly so far as Bell urges, and do not believe Congress so intended. In *Massachusetts Nurses Association* v. *Dukakis*, 726 F.2d 41 (1st Cir. 1984), the First Circuit Court of Appeals rejected an argument that a statute aimed at restraining increases in hospital costs impermissibly interfered with the collective bargaining efforts of the Massachusetts Nurses Association in such a way that the statute must be held to be pre-empted by the Labor Management Relations Act, stating:

> [I]n any industry the price of whose product or service — such as electric power, telephone, natural gas, or even rent controlled real estate — is regulated, a state would find its regulatory system vulnerable to pre-emptive attack on the

ground that the overall control of price was too inhibiting an influence on collective bargaining. Logic, however, would carry beyond simple price control. Any state or municipal program that substantially increased the costs of operation of a business in a competitive market would be similarly vulnerable to the pre-emption argument. Clean air and water laws, selective cutting requirements in forest operations, industrial safety standards, tax increases — all pro tanto hobble collective bargaining in that they constitute part of the universe in which collective bargaining takes place, just as do general prosperity or depression. But they do not add to or detract from the rights, practices, and procedures that together constitute our collective bargaining system.

*Id.* at 45. The same reasoning seems particularly applicable to this case.

Bell has failed to persuade me that the NLRA is so broad that the Arkansas Public Service Commission is prohibited, for purposes of establishing reasonable utility rates, from disallowing a small portion of Bell's wage and salary costs. The Commission does not purport to dictate any of the terms of Bell's collective bargaining agreement. It simply establishes a prospective revenue level for one aspect of Bell's utility operations, and restricts those revenues to a level consistent with an amount judged by the Commission to be the reasonable cost of providing service. The Commission did not mandate wage and salary expenditures that the appellant may or may not make — these decisions remain solely within the discretion of Bell's management. The Commission merely set a limit on what portion of those expenses the appellant will be authorized to recover from Arkansas consumers in the form of rates paid for telephone services.

TOM GLAZE, Judge, concurring in part and dissenting in part. I concur with the majority's reasoning upholding the Commission's authorized rate of return and repression and Yellow Page adjustments, but I dissent as to the pre-emption issue.

Although I largely concur in the result reached by the majority, I am truly perplexed by the manner in which the Commission applied the Discounted Cash Flow (DCF) formula.

While I must agree with the majority that the appellant has not shown such a clear abuse of discretion that overturning the Commission's action is warranted, I do feel the Commission has approached the outer limits of its discretion by misapplying the formula it used and reaching the result it did in this case. It makes absolutely no sense to use a formula based on certain premises and theories and then to disregard those premises and theories in the application of the formula. The Commission's particular application of the DCF formula was clearly contrary to the testimony of the expert witnesses on both sides.

Had the Commission not taken the upper end of its cost of equity range as its reference point, I would be unable to affirm a different, lower cost of equity calculation in view of the testimony and recommendations of the expert witnesses who testified on the issue of cost of equity. The Commission should not adopt a formula like the DCF method, and then incorrectly or inconsistently apply the formula, contrary to the testimony of the expert witnesses before it, in such a manner as might yield an unfair result. I am of the opinion that, if the Commission is going to employ a ratemaking formula, it should stick to the formula and not pick and choose outside the formula's boundaries in order to achieve a result.

Although I am concerned with the data used by the Commission in calculating Bell's cost of equity, I cannot say, *under the facts of this case*, that the result reached was unjust. Even though the method employed may be afflicted with infirmities, this court cannot intercede unless the method additionally yields an infirm result. When the Commission decides to use a formula such as the DCF, I believe it should avoid toying with or misapplying that formula. To continue to do otherwise will eventually cause an unjust result and reversible error.