ASSOCIATED NATURAL GAS COMPANY *v.*
ARKANSAS PUBLIC SERVICE COMMISSION

CA 87-20 752 S.W.2d 766

Court of Appeals of Arkansas
En Banc
Opinion delivered July 6, 1988
[Rehearing denied August 17, 1988.]

116

*Mitchell, Williams, Selig & Tucker*, by: *Kent Foster, Michael O'Malley, and Joe Madden*, for appellant.

*Douglas R. Strock*, Chief Counsel, for appellee.

JAMES R. COOPER, Judge. The appellant, Associated Natural Gas Company (ANG), a wholly-owned subsidiary of Arkansas Power and Light Company (AP & L), appeals from an order of the Arkansas Public Service Commission granting it a rate increase of $311,202.00 on its request for an increase of $992,948.00. ANG's application was filed on December 20, 1985, and if granted in full, would have increased rates for its customers in Arkansas by 6.56%.

The appellant seeks reversal of the Commission's decision on four points. First, ANG contends that the 6.52% return on equity allowed it by the Commission is arbitrary and not based on substantial evidence; specifically, ANG contends that the use of "double leverage" in determining its return on equity is inappropriate in this case or, at the very least, the method was incorrectly applied. Second, ANG contends that the adoption of the "modified balance sheet approach" to estimate its working capital requirement is incorrect and is not supported by substantial evidence. Third, ANG claims that the Commission's disallowance of a particular item of payroll expense is erroneous. Finally, ANG contends that the elimination of certain expenses claimed

by it is arbitrary and not supported by substantial evidence.

We agree with ANG that the application of the concept of double leverage in these particular and unique circumstances is error and, therefore, we reverse on that point. We affirm the Commission's decision in all other respects.

Our review of appeals from the Public Service Commission is limited by the provisions of Ark. Stat. Ann. Section 73-229.1 (Supp. 1985) [Ark. Code Ann. Section 23-2-423(c)(3), (4), and (5) (1987)], which defines our standard of review as determining whether (1) the Commission's findings of fact are supported by substantial evidence; (2) the Commission has regularly pursued its authority; and, (3) the order under review violated any right of the appellant under the laws or Constitution of the State of Arkansas or the United States. When this Court reviews such cases, we give due regard to the expertise of the Commission, which derives its ratemaking authority from the Arkansas General Assembly. The Commission has broad discretion in choosing an approach to rate regulation and is free, within its statutory authority, to make any reasonable adjustments which may be called for under particular circumstances. *General Telephone Co.* v. *Arkansas Public Service Commission,* 272 Ark. 440, 616 S.W.2d 1 (1981);*Southwestern Bell Telephone Co.* v. *Arkansas Public Service Commission,* 18 Ark. App. 260, 715 S.W.2d 45 (1986). In light of these considerations as to our standard of review, we now turn to the issues presented by appellant on appeal.

ANG first argues the Commission's finding allowing it a return on equity of only 6.52% is arbitrary, unreasonable, unjust and confiscatory and is not based on substantial evidence. Specifically, ANG argues that it was error for the Commission to apply what is known as double leverage to ANG; to ignore the greater risk to ANG stockholders which results from application of double leverage; and, to rely on historical growth data to find a 13% return on AP & L's common equity.

The fact that ANG is a wholly-owned subsidiary of AP & L makes calculation of its required return on equity more difficult

because its stock is not publicly traded;[1] therefore, double leverage was used here to impute to the subsidiary corporation (ANG) as its return on equity the parent corporation's (AP & L's) overall cost of capital and thereby provide a means to calculate the return on equity for ANG. Double leverage recognizes that in most cases it is probable that all sources funding a parent corporation's capital structure contribute relatively to the purchase of equity in the subsidiary corporation. Indeed, this Court and the Arkansas Supreme Court have recognized double leverage as a valid tool for the Commission to use. *General Telephone Co., supra; Arkansas Public Service Commission* v. *Lincoln-Desha Telephone Co.,* 271 Ark. 346, 609 S.W.2d 20 (1980); *Southwestern Bell Telephone Co.* v. *Arkansas Public Service Commission,* 267 Ark. 550, 593 S.W.2d 434 (1980).

In *Arkansas Public Service Commission* v. *Lincoln-Desha Telephone Co., supra,* the Arkansas Supreme Court said:

> Corporations are usually financed partly with debt capital and partly with equity capital. "Leverage" is a financial term used to describe the situation in which a corporation is funded by debt in addition to the equity supplied by the stockholders. A corporation is said to be "leveraged" to the extent that debt is included in its capital structure. The leverage arises from the advantage gained by equity holders through the rental of capital at a lower rate than the return they receive on their equity. Thus, we see that by use of leverage the equity owners are able to earn an overall rate of return in excess of the cost of capital. The added earnings above the costs inure to the benefit of the stockholders as they then receive a higher rate of return than if the institution had been financed entirely by equity.

271 Ark. at 348-49, 609 S.W.2d at 22.

The parties do not dispute the validity of the concept of double leverage as a general proposition, but the appellant argues

---

[1] A method known as the "discounted cash flow" (DCF) formula is often used to derive a corporation's return on equity and depends on market information for its application. *Walnut Hill Tel. Co.* v. *Arkansas Public Service Comm'n,* 17 Ark. App. 259, 709 S.W.2d 98 (1986).

that because of the undisputed facts surrounding ANG's acquisition by AP & L, the existence of double leverage between AP & L and ANG is impossible, and is in fact illegal, and therefore the application of the concept in the calculation of ANG's required return on equity is inappropriate. We agree.

Associated Natural Gas Company was engaged in supplying gas service to customers in the State of Missouri until 1953, when it was acquired by Arkansas-Missouri Power Company (Ark-Mo Power), a utility which sold both electricity and natural gas in Arkansas and Missouri. Even after the acquisition of ANG, state regulatory agencies treated ANG and Ark-Mo Power independently. This situation existed until the early 1970's, when Middle South Utilities, Inc., a public utility holding company, bought Ark-Mo Power, thereby acquiring 100% ownership of ANG's common stock. Middle South Utilities also owns all of the common stock of Arkansas Power & Light Company, an electric utility, and as a condition of the acquisition by Middle South, the Securities and Exchange Commission required Middle South to dispose of Ark-Mo Power's gas operations within one year. Apparently, Middle South was unable to comply with this requirement, and in 1976, it sought revocation of the divestiture requirement. The SEC declined to waive the divestiture order but suggested that Ark-Mo consolidate all of the gas operations of Ark-Mo and Associated Natural Gas into ANG. This was accomplished in 1978. Ark-Mo then operated as an electric utility, and ANG operated as its wholly-owned subsidiary gas utility until 1981, when AP & L merged with and absorbed all of Ark-Mo's operations. In effecting the absorption of Ark-Mo and the acquisition of ANG's common stock, AP & L swapped its own first mortgage bonds to Ark-Mo bond holders in a debt-for-debt swap. Middle South exchanged AP & L common stock for Ark-Mo common stock in order to accomplish the equity side of the merger.

Ernest L. McKenzie, ANG's vice-president, chief financial officer, secretary, treasurer, and a member of its board of directors, was personally involved in virtually all of the transactions outlined above and testified in great detail as a witness in the hearings below. The important essence of McKenzie's testimony is that the acquisition of ANG by AP & L was a non-cash transaction involving the swap of bonds for bonds and stock for

stock; that it is impossible for borrowed funds to have been used by AP & L to purchase ANG common stock; that, since AP & L acquired ANG, it has purchased no additional stock nor has it loaned any money to ANG;[2] and that the gas operations of ANG have remained strictly separate from the electric operations of its parent company, AP & L, since the parent-subsidiary relationship came into being.

We agree that the use of double leverage was inappropriate in this case because of one critical fact: none of Arkansas Power & Light Company's debt could possibly have been used to finance its acquisition of ANG. Arkansas Power & Light was prohibited by law from using debt to purchase ANG; therefore, it is impossible for AP & L's debt to leverage down to ANG. It is inappropriate to use AP & L's overall cost of capital to determine ANG's cost of equity, because AP & L's investment in ANG's stock cannot consist of anything but a portion of AP & L's equity capital. An elementary premise on which the application of double leverage depends is missing from this case, i.e., that a parent corporation has debt-funding available to it which may be used to purchase the subsidiary corporation's stock.

The PSC claims that ANG's argument makes a mistaken assumption that no debt was used by AP & L to fund its investment in ANG. The PSC contends that all capital dollars are fungible, i.e., they cannot be traced to their source, and each dollar is an inseparable element of every financial transaction. While we agree that, as a general proposition, all dollars in a company's capital structure are fungible, we cannot accept the argument that the concept of fungibility should be recognized in this particular case because doing so would be absolute fiction. We hold that, because it is a factual and legal impossibility for double leverage to exist between this parent and this subsidiary corporation, as proven by the unrefuted evidence, the application of the concept of double leverage to this subsidiary corporation to ascertain its cost of equity for ratemaking purposes is inappropriate.

---

[2] The parties agree that the Public Utilities Holding Company Act and applicable rules and regulations of the Securities and Exchange Commission prohibit such transactions.

Because we hold that the application of double leverage is inappropriate in these particular circumstances, we do not need to address the appellant's two remaining issues concerning its increased risk as a result of double leverage and the return on equity used for ANG's parent company by the Commission.

We now turn to the appellant's contention that the use of the Modified Balance Sheet Approach (MBSA) to compute ANG's working capital is incorrect. The MBSA is a relatively new ratemaking tool, but it has been used with approval in other cases. *General Telephone Co. of the Southwest v. Arkansas Public Service Commission,* 23 Ark. App. 73, 744 S.W.2d 392 (1988), *aff'd,* 295 Ark. 595, 751 S.W.2d 1 (1988). The use of the Modified Balance Sheet Approach to determine working capital in this case was not impermissible, and the appellee's use of it is supported by substantial evidence.

Working capital is the cash and other non-plant investment in assets a utility must maintain in order to meet its current financial obligations and provide utility service to its customers in an economical and efficient manner. Since at least part of working capital represents a contribution from investors, an amount is generally included in the calculation of a utility's rate base upon which a return is allowed.

Generally, the working capital allowance is derived through a device known as a "lead/lag study," which attempts to measure the advances and delays involved with expenses and revenues associated with a company's operations on a day-to-day basis. ANG submitted a lead/lag study in this case, which was accepted by the PSC staff subject to some adjustments. The staff additionally used an MBSA but advocated adoption of ANG's lead/lag study subject to staff's adjustments. The Commission rejected the lead/lag study as submitted by ANG and also rejected the adjusted lead/lag study advocated by the PSC staff because "a lead/lag must separately provide the amounts of working capital assets on a jurisdictional basis and the working capital liabilities on a total company basis." Neither the appellant nor the staff used total company liabilities and instead used Arkansas-only jurisdictional assets and liabilities. The appellant argues that our decision in *Southwestern Bell Telephone Co. v. Arkansas Public Service Commission,* 19 Ark. App. 322, 720 S.W.2d 924 (1986),

prevents the use of Arkansas-only jurisdictional assets and total company liabilities. That decision is not applicable here.

In *Southwestern Bell, supra*, we required that consistent treatment be given all components of a public utility's capital structure. We held there that the use of Arkansas-only customer deposits along with total-company equity, debt, accumulated deferred income taxes and investment tax credits in calculating the company's weighted cost of capital was inconsistent and reversed and remanded on that basis. Here, no such inconsistency exists: liabilities were treated consistently on a total-company basis, and assets were treated consistently on an Arkansas-only basis. We hold that the Commission's decision to use Arkansas-only assets and total company liabilities in preparing the MBSA to determine working capital is supported by substantial evidence and does not run afoul of this Court's directives in *Southwestern Bell*.

The appellant's argument that the MBSA was not properly prepared is without merit. Our Supreme Court addressed this identical issue in *General Telephone Co. of the Southwest* v. *Arkansas Public Service Commission*, 295 Ark. 595, 751 S.W.2d 1 (1988), and affirmed the disallowance of "return on return." From our review of the record, we cannot say that the Commission's refusal to allow a return on return in this case was improper.

Next, ANG claims that the MBSA adopted by the Commission erroneously included a liability consisting of $631,364.00 of "quick turn-around" accumulated deferred income taxes (ADIT) in ANG's capital structure. ANG contends that the Commission should have accepted the testimony of its own witness, who testified that the tax timing differences will average out to zero in the short-term period. The PSC staff contends, on the other hand, that the amount of ADIT included by the Commission was fairly representative of a normal level of ADIT and was, therefore, proper, because ADIT is a source of cost-free capital.

As we pointed out in *General Telephone, supra*:

It is apparent that no particular methodology is precise and that a determination of working capital is in many respects

an exercise of discretion as to what particular method yields the most fair and equitable result in each case. Without question, the particular amount of working capital allowance, along with the particular methodology used to derive that amount, is a matter of educated opinion, expertise, and informed judgment of the Commission and not one of mathematically demonstrable fact.

As the trier of fact in rate cases, it is within the province of the appellee to decide on the credibility of the witnesses, the reliability of their opinions, and the weight to be given their evidence. The appellee is never compelled to accept the opinion of any witness on any issue before it. The appellee is not bound to accept one or the other of any conflicting views, opinions, or methodologies. *Arkansas Public Service Commission v. Continental Telephone Co.,* 262 Ark. 821, 561 S.W.2d 645 (1978).

*General Telephone,* 23 Ark. App. 83. From our review of the evidence, we cannot say that the appellee's acceptance of this tax adjustment is not supported by substantial evidence. Once the appellate court determines the appellee's factual findings are supported by substantial evidence, we defer to the expertise of the Commission. *General Telephone,* 295 Ark. *supra.*

 ANG contends that the PSC erroneously disallowed a payroll expense adjustment proposed by ANG to permit it to recover expenses associated with a newly-created position of vice-president of marketing carrying with it a salary of $70,000.00 per year. Ark. Stat. Ann. Section 73-217.5 (Supp. 1985) [Ark. Code Ann. Section 23-4-406 (1987)] provides in pertinent part as follows: ". . . [t]he Commission shall permit adjustments to any test years . . . to reflect the effects on an annualized basis of any and all changes and circumstances which may occur within twelve months after the end of such test year where such changes are both reasonably known and measurable." Here, the PSC staff argued against inclusion of ANG's proposed adjustments because the person selected to fill the position in question did not begin work until about two weeks following the end of the *pro*

*forma* year.[3]

In *Southwestern Bell Telephone Co.* v. *Arkansas Public Service Commission,* 18 Ark. App. 260, 268, 715 S.W.2d 451, 455 (1986), we said:

> It seems logical that a point or period in time must be fixed during the ratemaking process at which the interjection of variables must cease and rate calculations committed to paper. Only then can there be an element of certainty in this often uncertain process.

The adjustment proposed by ANG and rejected by the Commission in this case is the very type of dispute which Section 73-217.5 [Code Section 23-4-406] was designed to prevent. While the action of ANG in establishing a position and setting the salary for the position occurred at the very end of the twelve-month period following the end of the test year, the record reflects that the expenses associated with that position were not to be incurred during that *pro forma* year. The Commission's refusal to allow ANG's expense adjustment was correct. *See General Telephone, supra.*

Finally, ANG complains that the rejection of certain expenses associated with billings from Middle South Services, a corporation providing services to affiliates of Middle South Utilities Company, is error. Staff witness Lewis proposed elimination of $32,298.00 of these expenses, and the Commission adopted his recommendation in its final order. Company witness McKenzie testified in order to explain the expense items eliminated by Lewis, who claimed that the expenses were associated with lobbying efforts, did not benefit ratepayers, or were simply not justified by the appellant.

ANG has the burden under Ark. Stat. Ann. Section 73-237 (Repl. 1979) [Ark. Code Ann. Section 23-2-417 (1987)] to justify the rate application it filed with the Commission. Here, the Commission accepted the recommendation of the staff witness and was apparently unpersuaded by the explanations offered by the company witness as to the reasonableness of

---

[3] The *pro forma* year consists of the twelve months immediately following the end of the test year.

the expenses disallowed. Since the Commission is the trier of fact, it is within its province to assess the credibility of the witnesses, the reliability of their opinions, and the weight to be accorded the evidence presented by the witnesses. *Arkansas Public Service Commission* v. *Continental Telephone Co.,* 262 Ark. 821, 561 S.W.2d 645 (1978). We cannot say from the record before us that the Commission's acceptance of witness Lewis' expense disallowance recommendation was incorrect.

We reverse and remand the decision of the Commission with respect to the use of double leverage in these particular and unique circumstances, with the sole consideration on remand to focus on the appropriate methodology by which the appellant's return on equity may be calculated and then included in its rate of return calculations. In all other respects, the decision of the Commission is affirmed.

Affirmed in part, reversed in part, and remanded.