Winston BRYANT, Attorney General *v.* ARKANSAS
PUBLIC SERVICE COMMISSION

CA 95-448 924 S.W.2d 472

Court of Appeals of Arkansas
En Banc
Opinion delivered June 26, 1996
[Petition for rehearing denied August 14, 1996.*]

---

*Mayfield and Neal, JJ., would grant.

158

162

*Winston Bryant*, Att'y Gen., by: *Shirley E. Guntharp*, Deputy Att'y Gen., and *Shawn McMurray*, Ass't Att'y Gen., and *Virginia H. Castleberry*, Ass't Att'y Gen., for appellant.

*Paul J. Ward*, for appellee.

*Ann E. Meuleman, Garry S. Wann*, and *Ivester, Skinner & Camp, P.A.*, by: *H. Edward Skinner*, for Southwestern Bell Telephone Company.

JAMES R. COOPER, Judge. The Attorney General appeals from orders issued by the Arkansas Public Service Commission (Commission) pursuant to an audit of costs allocated to Southwestern Bell Telephone Company (SWBT) by SWBT's parent corporation and affiliates.

To clearly understand the issues presented, we must first discuss findings made by the Commission in a prior docket. In September 1992, Commission Docket No. 92-260-U was initiated by the Commission Staff (Staff) to investigate SWBT's earnings level. Staff filed traditional rate-case testimony in the docket based on a test year of December 31, 1991. Staff concluded from its analysis that SWBT's rates produced earnings in excess of a reasonable revenue requirement. On May 3, 1993, a Stipulation and Agreement (Stipulation) agreed to by Staff, SWBT, AT&T Communications, Sprint Communications Company L.P., GTE Southwest Incorporated, GTE Arkansas Incorporated, and sixteen rural local exchange companies was filed in Docket No. 92-260-U to resolve the issues raised by the investigation. The Stipulation provided that, in lieu of proposed reductions to its rates, SWBT would make an incremental investment of $231 million over a three-year period to upgrade its infrastructure in Arkansas. The Stipulation provided:

> The basic aspects of the [Stipulation] can be summarized as consisting of a significant network modernization plan, conversion to single party service in all exchanges served by SWBT, service to two previously unallocated ter-

ritories, and recognition of certain financial accounting changes .... This Stipulation and Agreement also contains a redefinition of basic local service for SWBT ... to include single party service with touch-tone and provides for a reduction in the current rates for touch-tone service. It incorporates the elimination of mileage charges for rural customers with the conversion of those exchanges to single party service and implements a reduction of special connection charges for the extension of facilities to rural areas.

The Stipulation also provided for the additional investment to be treated as a part of SWBT's rate base. It further stated:

The Parties agree that the estimated value of these improvements is $231 million, and the annual revenue requirement effect based on the additional investment and associated costs is approximately $19.3 million. The Parties agree that the $19.3 million annual revenue requirement effect from investment and expenses is offered in lieu of potential reductions to SWBT's existing rates.

In the Stipulation, the parties estimated that the touch-tone rate reduction would reduce SWBT's revenues by $6.1 million annually and that the elimination of Outside the Base Rate Area (OBRA) mileage charges would reduce SWBT's revenues by $8.2 million annually. The parties agreed that Staff's ongoing audit of costs allocated to SWBT's Arkansas division by its parent company and affiliates (the St. Louis audit) would continue until Staff deemed it completed.

Prior to the hearings held to address the Stipulation and the Attorney General's objections to it, the Commission ordered Staff and SWBT to respond by testimony to specific questions about the earnings review and the Stipulation. In addition, the Commission ordered an update of the test-year financial information based on a test year ending May 31, 1993. Forty-seven witnesses testified at the hearings which began on September 14, 1993.

On January 27, 1994, the Commission entered Order No. 38, finding that the Stipulation was in the public interest and approving it with some modifications. In its thirty-seven-page order, the Commission presented a detailed examination and discussion of the testimony and exhibits presented in the docket and concluded:

The evidence is substantial that the Stipulation as a whole is in the public interest and will serve the needs of the people of Arkansas for a modern telecommunications system capable of carrying the state into the future. The Stipulation is an obvious departure from the normal course of a show cause proceeding to reduce a utilities rates when there is an allegation of overearning. The Stipulation does provide for some reductions in rates but it is novel as a proposal to invest for the future. The customers of SWBT will have access to a modern and more efficient telecommunications system in only three years without having to face increased rates to cover the costs. People in two areas of the state will have telephone service with the ability to call and be called for business, health or personal reasons where no telephone service has been available in the past. Schools and health care facilities will be able to provide more classroom choices, remote services and better quality services with the Distance Learning and Rural Health Care Networks. The state will be more attractive to high-tech industries with the development of fiber parks and a better educated work force through distance learning. For all these benefits to the people of this state, the Stipulation is a reasonable and advantageous resolution of the issues in this docket and is hereby approved.

The Commission also determined that "[t]he public will reap greater long term advantages from infrastructure upgrades than possible from a minor rate adjustment." The Commission noted that the $19.3 million annual revenue requirement effect from the investment and expenses in the Stipulation was offered in lieu of potential reductions of existing rates but also recognized that the Stipulation proposed the elimination and reduction of certain charges. The Commission conditioned its approval of the Stipulation on SWBT's agreement not to request a general change in rates on or before December 31, 1996.

The accounting procedure ordered by the Commission directed SWBT to treat the annual revenue excess of approximately $33 million as a deferred credit accruing interest until the occurrence of a general rate change. At that time, the balance in the deferred account was to be used to reduce any revenue deficiency or increase any revenue excess.

Apart from the Stipulation, the Commission also approved

Staff's recommended change in depreciation rates for analog switching. The Commission noted that, pursuant to the Stipulation, SWBT would be 100 percent digital by the end of 1996, and found that the depreciation expense should be increased to avoid an accumulated depreciation reserve shortfall.

SWBT subsequently filed a motion to clarify the procedure for developing the investment monitoring report, stating that the monitoring and accounting formula should recognize the touch-tone and OBRA mileage revenue reductions and the additional expense resulting from the increased analog switch depreciation rates. Order No. 40 approved SWBT's proposed report with some modifications. The resulting report provided that, on the first day of each month, one-twelfth of the revenue surplus (1/12 of $33,002,130.00) would be credited to the account. In addition, the report provided for the following monthly debits to the account: one-twelfth of the annual revenue requirement associated with the plant placed in service under the plan; the additional depreciation expense associated with the analog switch investment; and the revenue reductions resulting from the touch-tone and OBRA provisions. The report also provided that the revenue generated as a result of the investment would be credited monthly to the account and that interest would be credited or debited to the account based on the balance at that point. The docket remained open for the filing and review of the quarterly reports.

Neither the Attorney General nor any other party appealed from Order Nos. 38 and 40.

The docket that is the subject matter of this appeal is Commission Docket No. 94-169-U (the Audit docket), opened by the Commission on May 24, 1994, in response to Staff's audit of costs allocated or charged to SWBT's Arkansas Division (SWBTA)[1] by Southwestern Bell Corporation. In Order No. 1, the Commission directed Staff to complete the St. Louis audit using a test year compatible with the test year utilized in the Stipulation docket, and established a procedural schedule for filing and reviewing the audit report. The Attorney General also participated in this docket.

---

[1] In portions of this opinion, SWBT is also referred to as SWBTA (i.e. SWBT-Arkansas) because that is how SWBT is referred to by the parties. For purposes of this opinion, SWBT and SWBTA are the same.

The St. Louis audit report was filed by Staff on September 20, 1994. The report recommended that $8,810,114.00 in expenses that had been improperly allocated to SWBTA be disallowed. The report also stated that the audit trail necessary to trace CDP (Cost Distribution Process for Information Services) charged to SWBTA's cost of service by SWB General Headquarters (GHQ) was inadequate; however, that the alternative steps taken were adequate to assess the appropriateness of these expenses for ratemaking purposes. The audit report also included an entry that adjusted accumulated depreciation to recognize the impact of the new analog switch depreciation rate, approved in Order No. 38 of the Stipulation docket. The report stated that the depreciation adjustment, the disallowance of $8,810,114.00 in improperly allocated expenses, and other appropriate adjustments to the test year resulted in a gross revenue excess of $27,768,136.00, and that this revenue excess represented a decrease of $5,233,995.00 from the $33,002,130.00 revenue excess in the Stipulation Docket. The report recommended no change in rates for SWBTA at that time.

On November 3, 1994, Staff and SWBT entered into an Agreement to address Staff's general concerns about allocations and the lack of an audit trail. The Agreement was designed to complete the audit and resolve all issues in the docket and provided that a consultant would be retained to develop an action plan to address Staff's concerns. The Attorney General objected to Staff's failure to recommend a change in SWBT's rates pursuant to the disallowed expenses and objected to the Agreement that was proposed to address Staff's general concerns about the audit process.

In Order No. 14, the Commission responded to the Attorney General's argument and approved the audit report's recommendation of no change in SWBT's rates and approved the proposed Agreement. Order No. 15 denied the Attorney General's application for rehearing. The Attorney General then filed his Notice of Appeal from Order Nos. 14 and 15, raising three general issues: (I) that the Commission's use of the Stipulation docket to avoid reducing SWBT's rates after Staff disallowed $8.8 million in expenses was an abuse of discretion; (II) that the Commission failed to abide by its statutory obligations when it refused to disallow $13.5 million in CDP costs, after it was determined that these costs could not be traced because of an inadequate audit trail; and (III) the Commission erred in refusing to allow the Attorney Gen-

eral to pursue relevant discovery and introduce relevant information.

Our review of appeals from the Commission is limited by the provisions of Arkansas Code Annotated § 23-2-423(c)(3), (4), and (5) (Supp. 1995), which defines the standard of judicial review as determining whether the Commission's findings of fact are supported by substantial evidence, whether the Commission has regularly pursued its authority, and whether the order under review violated any right of the appellant under the laws or the Constitutions of the State of Arkansas or the United States. *Bryant* v. *Arkansas Pub. Serv. Comm'n*, 46 Ark. App. 88, 102, 877 S.W.2d 594 (1994). In *AT&T Communications of the Southwest, Inc.* v. *Arkansas Pub. Serv. Comm'n*, 40 Ark. App. 126, 843 S.W.2d 855 (1992), this Court stated:

> The Arkansas Public Service Commission has broad discretion in exercising its regulatory authority, *Associated Natural Gas Co.* v. *Arkansas Pub. Serv. Comm'n*, 25 Ark. App. 115, 118, 752 S.W.2d 766, 767 (1988), and courts may not pass upon the wisdom of the Commission's actions or say whether the Commission has appropriately exercised its discretion. *Russellville Water Co.* v. *Arkansas Public Serv. Comm'n*, 270 Ark. 584, 588, 606 S.W.2d 552, 554 (1980). It has often been said that, if an order of the Commission is supported by substantial evidence and is neither unjust, arbitrary, unreasonable, unlawful, or discriminatory, then this court must affirm the Commission's actions. *Arkansas Elec. Energy Consumers* v. *Arkansas Pub. Serv. Comm'n*, 35 Ark. App. 47, 76, 813 S.W.2d 263, 279 (1991). Nevertheless, it is for the courts to say whether there has been an arbitrary or unwarranted abuse of discretion, even though considerable judicial restraint should be observed in finding such an abuse. *Russellville Water Co.* v. *Arkansas Pub. Serv. Comm'n*, 270 Ark. at 588, 606 S.W.2d 554. Administrative action may be regarded as arbitrary and capricious only where it is not supportable on any rational basis, and something more than mere error is necessary to meet the test. *Woodyard* v. *Arkansas Diversified Ins. Co.*, 268 Ark. 94, 97, 594 S.W.2d 13, 15 (1980). To set aside the Commission's action as arbitrary and capricious, the appellant must prove that the action was a willful and unreasoning action, made without consideration and with a disre-

gard of the facts or circumstances of the case. *Partlow* v. *Arkansas State Police Comm'n*, 271 Ark. 351, 353, 609 S.W.2d 23, 25 (1980). *See also Beverly Enters.-Ark., Inc.* v. *Arkansas Health Servs. Comm'n*, 308 Ark. 221, 230, 824 S.W.2d 363, 367 (1992).

40 Ark. App. at 129–30.

## I.

The Attorney General's first argument for reversal relates to the Commission's refusal to lower SWBT's rates pursuant to the finding of a disallowance of $8.8 million in the Audit docket. The underlying premise of his argument is that the Commission erred in its treatment of the accelerated depreciation rates for SWBT's analog switches. Specifically, the Attorney General complains that the Commission erred in comparing SWBT's excess earnings in the Audit docket with SWBT's excess earnings that it approved in the Stipulation docket because the effect of the new depreciation rates was considered in the Audit docket but was not considered in the Stipulation docket. He asserts that the disparate treatment of the rates resulted in ratepayers being denied the benefit of an $8.5 million reduction in SWBT rates.

At the hearing in the Audit docket, the Attorney General presented the testimony of Basil L. Copeland, Jr., an economist specializing in energy and utility economics. Copeland testified that the revenue requirement exhibits from Docket No. 92-260-U (the Stipulation docket) had to be adjusted to recognize the depreciation rate change before considering the St. Louis audit adjustments. He stated in his prepared testimony: "Only *then* do we have a true and accurate picture of how the proposed [St. Louis audit] adjustments impact the level of revenue requirement that has *already* been determined to be just and reasonable." (Emphasis in original.) Copeland testified that the parties to the Stipulation agreed that the proposed investment and expenses had a value of $19.3 million (the $33 million in excess revenues when adjusted for the depreciation change). He contended that the $19.3 million should be compared to the $28 million excess supported by Staff in the Audit docket, which would demonstrate a revenue excess of over $8 million and require a decrease in SWBT's rates.

In rebuttal, Keith R. Mittledorf, a consultant who had recently retired as chief accountant for the Arkansas division of SWBT,

testified for SWBT that his calculations showed a reduction in SWBT's annual excess earnings from approximately $33 million to $28 million. Mittledorf stated that the reduction demonstrated that Arkansas customers would benefit by more than $5 million annually for the three years covered by the Stipulation because those customers were receiving more in revenue reductions and modernization improvements than a pure cost of service determination would provide.

John Stode, Staff telecommunications manager, denied that the parties agreed that the value of the Stipulation was $19.3 million, contending that Copeland's calculations ignored the rate reductions, including $6.1 million in touch-tone reductions and $8.2 million in eliminated mileage charges, and non-priced benefits such as service to two previously unallocated, unserved areas of the state. Stode testified that the Commission's approval of the change in depreciation rates was separate from the approval of the Stipulation and that there was no mention of the change in rates in the Stipulation. He stated that the recommendation of a change in rates was conditioned on the approval of the Stipulation.

In Order No. 14, the Commission addressed the Attorney General's objections in part as follows:

> The [Attorney General's] position that refunds or rate reductions are required as a result of the findings of the St. Louis audit appear to hinge on the [Attorney General's] contention that the value of the Stipulation approved in Docket No. 92-260-U is only $19.3 million, and thus ratepayers have not received a value equal to the amount of excess earnings. The figure of $19.3 million cited by the [Attorney General] is *not* the value of the Stipulation, but rather is the effect on SWBT's revenue requirement of the $231 million in investment and expenses that SWBT agreed to undertake pursuant to the Stipulation. To determine the value of the Stipulation, *all* components of the Stipulation must be considered, including the elimination of [OBRA] mileage charges, the reduction in charges paid by rural SWBT customers, and the rate reduction in touchtone charges for both residential and business customers. While the [Attorney General] may consider approximately $14.3 million in previous rate reductions as inconsequential to this docket, such savings to ratepayers will not be disregarded by

this Commission.

(Emphasis in original.)

 The Commission concluded that the $8.8 million in expenses disallowed by Staff in the audit report were exceeded by SWBT's increased depreciation expenses of $13.5 million which was ordered but not recognized in the revenue requirement calculation made in the Stipulation docket. From our review, we conclude that this Commission finding is supported by substantial evidence.

> The Public Service Commission is free, within the strictures of its statutory authority, to make the pragmatic adjustments which may be called for by particular circumstances. No public utility has an absolute right to any method of valuation or rate of return, and the PSC has wide discretion in its approach to rate regulation. This court is generally not concerned with the method used by the Commission in calculating rates as long as the Commission's action is based on substantial evidence. It is the result reached, and not the method used, which primarily controls. If the Commission's decision is supported by substantial evidence and the total effect of the rate order is not unjust, unreasonable, unlawful or discriminatory, judicial inquiry terminates. *Southwestern Bell*, 19 Ark. App. at 327, 720 S.W.2d at 927; *Southwestern Bell Tel. Co.* v. *Arkansas Pub. Serv. Comm'n*, 18 Ark. App. 260, 715 S.W.2d 451 (1986); *Walnut Hill Tel.*, 17 Ark. App. at 265, 709 S.W.2d at 99.

*Southwestern Bell Tel. Co.* v. *Arkansas Pub. Serv. Comm'n*, 24 Ark. App. 142, 144, 751 S.W.2d 8 (1988). The question on review of an administrative board's decision is not whether the evidence would have supported a contrary finding but whether it supports the finding that was made. *Bryant* v. *Arkansas Pub. Serv. Comm'n*, 50 Ark. App. 213, 234, 907 S.W.2d 140 (1995).

In connection with his first point, the Attorney General argues that the Commission refused to reduce SWBT's rates "by arbitrarily and capriciously 'layering' some aspects of [the Stipulation docket] upon the [Audit docket] while not 'layering' other aspects...." The Commission addressed the "layering" argument in Order No. 14 as follows:

> The Commission directed Staff to complete the St. Louis

audit using the May 31, 1993 test year adopted in [the Stipulation docket], so that a more accurate and final determination of SWBT's test year earnings could be made. The "layering" of these two dockets that the [Attorney General] so strenuously objects to is precisely the purpose of using the same test year. Without the results of all aspects of Staff's review of SWBT's May 31, 1993 test year earnings and expenses, it is not possible to obtain an accurate, complete analysis of SWBT's financial standing.

We agree with SWBT's response that the Audit docket was not a separate and distinct earnings investigation "but merely the concluding and final part" of the investigation begun in the Stipulation docket. In both dockets, the Commission was reviewing evidence of twelve months of historical data from SWBT's books and records for a test year ending May 31, 1993, with adjustments for reasonably known and measurable changes occurring in the *pro forma* year in accordance with Arkansas Code Annotated § 23-4-406 (1987). Order No. 14 of the Audit docket calculated four adjustments to the financial exhibits adopted in the Stipulation docket: $8.8 million in disallowed expenses, $13.5 million in additional depreciation expense, a change in SWBT's intraLATA toll pool revenue, and a change in the federal income tax rate.

The Attorney General also argues that the Commission abused its discretion in holding that Order Nos. 38 and 40 in the Stipulation docket could "cure," or provide a credit for, the revenue excess in the Audit docket. As discussed earlier, it was incumbent upon the Commission to use the entire results of the audit and the revenue requirement impact on SWBT of its orders in the Stipulation docket in assessing the revenue excess. We find no error on this point.

Nor do we agree with the Attorney General's contention that comparing the figures for revenue excess in the Audit and Stipulation dockets is "comparing apples to oranges" and that "fair-minded" persons could not reach a conclusion that it was a meaningful comparison. The Commission points out that the "$33 million was SWBT's revenue excess based on the test year ending 5/31/93 in [the Stipulation docket]. $28 million is the revenue excess based on the same test year when adjusted for the depreciation rate expense, recommended disallowances, toll pool revenue adjustment, and federal income tax rate change." We agree with the

Commission that comparing the $33 million revenue excess to the $28 million revenue excess is comparing the same bottom-line figure with appropriate adjustments.

▆▆ The Attorney General's argument in the preceding points appears to be premised on the view that, by the agreement of the parties, the value of the Stipulation automatically decreased by the amount of increased depreciation rates ordered, thereby effectively canceling the benefit of the increased depreciation expenses. We do not agree with this argument. The Stipulation was not conditioned on the approval of the new depreciation rates. The Commission certainly had the option of approving or rejecting the recommended rates, and, in Order Nos. 38 and 40, the Commission clearly accepted the $33.6 million value placed on the Stipulation. The parties and the Commission acknowledged in setting the monitoring-report procedure that SWBT was entitled to credit for the accelerated depreciation expense. The Attorney General recognizes the finality of the two orders, and his arguments on appeal about what the Commission could have done or should have done in the Stipulation docket are without merit. Further, we find no merit in the argument that the orders in the Audit docket constitute an impermissible attack on the earlier orders in the Stipulation docket, and we find no merit in the argument that the orders are inconsistent.

It is worth noting that the Attorney General has taken inconsistent positions in the course of this case. In his objection to SWBT's motion to clarify Order No. 38 in the Stipulation docket, the Attorney General clearly recognized that the depreciation rate increase was not a part of the Stipulation. This position is contrary to the position taken by the Attorney General in the Audit docket and on appeal.

▆▆ Having rejected the Attorney General's view that the value of the Stipulation was reduced from $33 million to $19.3 million, we conclude that the Commission's analysis in the Audit docket was appropriate. The Commission determined that SWBT's excess earnings were increased by the $8.8 million disallowed expense but decreased by the $13.5 million in depreciation expense, resulting in excess earnings of $28.3 million, or approximately $5 million less than the approved excess earnings in the Stipulation docket (the value of the Stipulation). Giving due deference to the expertise of the Commission in rate matters, *see Cullum v. Seagull*

*Mid-South, Inc.*, 322 Ark. 190, 194, 907 S.W.2d 741 (1995), we find that the Commission did not err in its treatment of the depreciation expense and the disallowed expense.

 The Attorney General next contends that it was error for the Commission not to adopt Copeland's approach to accounting for the depreciation expenses. It is within the province of the Commission, as the trier of fact in rate cases, to decide on the credibility of the witnesses, the reliability of their opinions, and the weight to be given their evidence. The Commission is never compelled to accept the opinion of any witness on any issue before it, nor is the Commission bound to accept one or the other of any conflicting views, opinions, or methodologies. *See Bryant* v. *Arkansas Pub. Serv. Comm'n*, 46 Ark. App. 88, 101, 877 S.W.2d 594 (1994). We find no merit in the Attorney General's argument.

 In a related point, the Attorney General argues that the Commission should have adopted Copeland's recommendation on how the deferred-account mechanism could be used to reduce rates by $8.5 million. In the alternative, the Attorney General argues that the Commission should have fully merged or layered the two dockets and amended Order Nos. 38 and 40 of the Stipulation docket to account for the disallowed expenses. Despite the Attorney General's erroneous assertion that Copeland recommended a change in the deferred-account mechanism, the Attorney General never suggested in testimony or argument that the Commission "fully layer" the two dockets and amend Order Nos. 38 or 40 and never suggested prior to the issuance of Order No. 14 in the Audit docket that the Commission revise the deferred-account monitoring reports. We have often stated that we will not address issues on appeal that were not raised below. *See Keesee* v. *Keesee*, 48 Ark. App. 113, 117, 891 S.W.2d 70 (1995); *Arkansas State Highway Comm'n* v. *Lee Wilson and Co.*, 43 Ark. App. 22, 27, 858 S.W.2d 137 (1993); *Arkansas Elec. Energy Consumers* v. *Arkansas Pub. Serv. Comm'n*, 35 Ark. App. 47, 66, 813 S.W.2d 263 (1991). Moreover, the Attorney General failed to satisfy Arkansas Code Annotated § 23-2-422(b) (1987), which requires that the application for rehearing set forth specifically the grounds upon which the application is based. This argument is not presented in the application.

 The Attorney General also contends that the Commission's orders must be reversed because SWBT's $28 million excess earnings in the Audit docket are unreasonable and are prohibited by

Arkansas Code Annotated § 23-4-103 (1987), which provides that all rates must be just and reasonable. Order Nos. 38 and 40 of the Stipulation docket assessed excess earnings at $33 million, approved the Stipulation, and set the value of the Stipulation. The Attorney General remained silent while that record was closed. Nevertheless, he now seeks to attack those orders.

> The order or determination of an administrative body, acting within its jurisidiction and under authority of law, is not subject to collateral attack. This is so in the absence of fraud or bad faith, or, under some authority, even on the ground of fraud. In this connection, it has been considered that the only method of attack available is by appeal as provided by statute.

73A C.J.S. *Public Administrative Law and Procedure* § 154 (1983). The Attorney General has failed to demonstrate that the orders are subject to collateral attack, and we therefore find no merit in this argument.

 The Attorney General further argues that the Commission abandoned the intent of the deferred account by giving SWBT credit for all components of the Stipulation without further study of the monitoring reports, which were not in evidence in the Audit docket. It is his contention that the Commission failed to determine if the ratepayers were receiving the appropriate value from the Stipulation docket. This argument must fail for numerous reasons. Again, we note that the Attorney General failed to appeal the orders entered in the Stipulation docket that established the deferred-account monitoring process. Second, this argument was not presented to the Commission in the Audit docket prior to the Commission's final order. The Attorney General introduced no evidence or testimony regarding the reports, made no arguments regarding the reports, and sought no accounting from the Commission. Finally, this argument was not made in his application for rehearing.

 The Attorney General's final point in this argument is that Order No. 14 violates the requirements of Arkansas Code Annotated § 23-2-421(a) (1987), which provides in pertinent part that "[t]he Arkansas Public Service Commission's decision shall be in sufficient detail to enable any court in which any action of the commission is involved to determine the controverted question

presented by the proceeding." The Attorney General argues that the order is defective because the Commission appeared to base its decision both on the "excess value" theory and on a determination that the disallowed expenses in the Audit docket were exceeded by SWBT's increased depreciation expense. The Attorney General refers this Court to *Bryant v. Arkansas Pub. Serv. Comm'n*, 45 Ark. App. 56, 63, 871 S.W.2d 414 (1994), where we stated: "Courts cannot perform the reviewing functions assigned to them in the absence of adequate and complete findings by the Commission on all essential elements pertinent to the determination." We have reviewed the Commission's findings and hold that they satisfy the requirements of Section 23-2-421(a) and the case cited above. It is clear from the findings that the Commission relied on all aspects of the test-year data in determining SWBT's financial standing. In addition, it is clear that the Commission considered all components of the Stipulation.

 In order to establish an absence of substantial evidence to support the Commission's order, the Attorney General had the burden of showing that the proof before the Commission was so nearly undisputed that fair-minded persons could not reach its conclusion, *see AT&T Communications of the Southwest, Inc. v. Arkansas Pub. Serv. Comm'n*, 40 Ark. App. 126, 131, 843 S.W.2d 855 (1992), and we hold that he failed to meet that burden. The Commission's decision is supported by substantial evidence and the total effect of the order is not unjust, unreasonable, unlawful, or discriminatory. We therefore affirm on the Attorney General's first argument.

## II.

Next, the Attorney General argues that the Commission erred in failing to disallow $13 million in expenses charged to SWBT-Arkansas (SWBTA) by SWB-General Headquarters (GHQ) because of a lack of a sufficient audit trail to track these expenses to their originating sources. These expenses were entered into the Cost Distribution Process for Information Services (CDP), which is utilized by GHQ to allocate cost for information technology services to the state jurisdictions.

In its audit report, Staff stated that it had been unable to trace any of the CDP charges on SWBTA's books to a specific originating source document, which demonstrated that the CDP process

itself did not provide a comprehensive audit trail. According to the report, however, Staff was able to review the costs prior to entry into the CDP resource pools to determine whether the expense was necessary for providing utility service. Staff stated that, because the identity of the transaction was lost upon entry into the resource pools, "there was no way to determine the proportionate amount that SWBTA ultimately received of each disallowable transaction flowing to CDP. " However, it was further stated that, by using the normal GHQ prorate factor to determine the portion attributable to SWBTA, Staff calculated that SWBTA apparently received through the CDP $236,485.00 less expense in the test year than would have been allocated through the normal GHQ prorate process. Staff concluded: "While the lack of a comprehensive audit trail for almost one-third of the expenses flowing to SWBTA from GHQ is very disconcerting, Staff believes that the alternative steps taken were adequate to assess the appropriateness of these expenses for ratemaking purposes."

Basil L. Copeland, Jr., the Attorney General's witness, relied on the audit report in recommending disallowance of the $13 million in expenses because they could not be "adequately verified owing to the lack of a comprehensive audit trail."

Steve Usselmann, SWBT's district manager for financial accounting and reporting, testified that the audit trail necessary to trace costs flowing from the GHQ prorate process and recorded in the Arkansas general ledger was adequate. He explained:

> In accordance with generally accepted auditing standards, an auditor must evaluate the system in determining audit risk. Audit tests are performed through the system or around the system to obtain sufficient, competent, evidential matter as to the appropriateness of the expenses. Auditing through the system constitutes the actual trace of a document from its source to the general ledger. Auditing around the system is a practice which substantiates that a large group of transactions can be traced from one process to the next and that the end result is reasonable when compared to an acceptable alternative. Thus, auditing around the system provides assurance on the reliability of a process. It is quite common to audit around the system in a complex or complicated process.

Usselmann concluded that "the Staff performed audit procedures

which provided the ability to assess the appropriateness of these expenses for ratemaking purposes. In other words, sufficient audit tests were performed by auditing around the system which is an acceptable method of auditing."

Marie James, audit supervisor for the Staff electric section, disagreed with Copeland's suggestion that the costs should be disallowed. She stated that although Staff was concerned about the lack of a comprehensive audit trail, the alternative steps taken were adequate to assess the appropriateness of the expenses for ratemaking purposes. James testified:

> Staff acknowledged in the [audit] report that, with [SWBT's] assistance, Staff successfully traced a selected sample of individual transactions from the special reports to the prorate audit trail report and to the original source documentation necessary to determine if the costs were appropriate for providing utility service. However, in Staff's opinion, the addition of grand totals by originating source and a unique identifying characteristic that flows from report to report would greatly enhance the auditability of SWBT's GHQ expenses, thus Staff's assessment that the audit trail is inadequate.

On November 3, 1994, SWBT and Staff entered into the Agreement "designed to complete the St. Louis Audit and resolve all issues in this Docket." It provided that "[t]he basis of the Agreement is for SWBT and Staff to jointly select a consultant to address Staff's concerns about the lack of an audit trail, the tracking of research and development costs, allocations, and charging directions." It further provided that "[i]t is the intent that the consultant be a firm with nationally recognized credentials and an established reputation for professionalism." SWBT agreed to pay the fee for the consultant. At trial, SWBT stated that it would not attempt to recover the cost from ratepayers.

In rebuttal testimony, Copeland stated that the Agreement served no useful purpose other than to protect SWBT. He stated: "The public gets only what it had a right to expect *as a minimum* to begin with, i.e. further investigation into the lack of auditability of expenses that are being allocated to Arkansas ratepayers." (Emphasis in original.) It was his conclusion that the Agreement should be rejected.

In Order No. 14, the Commission approved the Agreement and stated: "Clearly, ratepayers do benefit when Staff is able to more quickly and thoroughly perform an audit of SWBT's financial performance. Auditing costs incurred by both Staff and SWBT are reduced, and Staff is able to complete its audit more quickly, allowing it to pursue other regulatory obligations." Order No. 15 denied the Attorney General's application for rehearing.

The Attorney General makes three points in his second argument for reversal: (1) the Commission was obligated to accept his recommendation of disallowance of the $13 million in expenses because the amount of charges SWBTA received from the CDP system could not be traced to originating source documents; (2) Staff's position on the treatment of CDP costs was inconsistent with its position on research and development (R&D) costs; and (3) the Commission's findings were inadequate because the Commission refused to state its basis for rejecting the Attorney General's recommendation.

We hold that there was sufficient evidence to support the Commission's decision not to disallow the $13 million in expenses. Both the audit report and Marie James' testimony support a finding that Staff successfully traced a selected sample of individual transactions from the special reports provided by SWBT to the prorate audit trail report and then to the original source documentation necessary to determine whether the costs were appropriate for providing utility service. SWBTA witness Usselmann testified that the approach adopted by Staff, which he referred to as "auditing around a system," was an accepted auditing method. Both James and Usselmann have accounting credentials and audit experience. In contrast, the Attorney General presented the testimony of a witness who lacked accounting credentials, had never participated in a field audit, and did not examine SWBTA's books, but relied entirely on Staff's documents and testimony.

The Attorney General further argues that it was impossible to determine the proportionate amount that SWBTA received of each expense that was disallowed by Staff. We conclude that sufficient evidence was presented to the Commission from which it could approve the amount of expenses that should not be allowed. Staff explained in the audit report that the disallowed expense that SWBTA actually received in the test year was $236,485.00 less using the CDP process than it would have been using the average GHQ

prorate factor for Arkansas. Although we appreciate the Attorney General's concerns regarding the lack of an audit trail, these concerns were addressed in the Agreement, which is lengthy and details specific goals to be met, and provides that SWBTA and Staff jointly will select a consultant to address Staff's concerns about the audit trail and other procedures. Further, it provides that the consultant will operate under the supervision of Staff, with consultation from SWBTA, that SWBTA will pay the fee for the action plan which will be developed, and that the consultant's findings and recommendations will be submitted to the Commission. In Order No. 14, the Commission clearly found that ratepayers would benefit from the consultant's services.

We conclude that the Attorney General has failed to provide either factual or legal support for his argument and hold that the Commission Order No. 14 is neither arbitrary nor capricious. We affirm on this point.

We also find no merit in the Attorney General's contention that Staff's position that SWBTA benefits from the CDP charges contradicts Staff's position on R&D charges. The Commission addressed this contention in Order No. 14:

> Contrary to the [Attorney General's] claim, there is no inconsistency in the treatment of CDP charges and the complete disallowance of [R&D] costs. Staff faced different situations in those areas and treated them differently for legitimate reasons. The audit report stated the R&D costs were not traceable to regulated or nonregulated services. Ratepayers should not pay for unregulated or competitive services. Staff was able to determine that expenses entering the CDP were appropriate for rate recovery.

The Attorney General's final point in this argument is that the Commission erred in refusing to state its basis for rejecting the Attorney General's recommendation. In Order No. 14, the Commission adopted Staff's recommendations regarding the audit report. The Commission also addressed at length the Agreement and the Attorney General's argument that it would provide no benefits. In the application for rehearing, the Attorney General argued that the Commission had failed to rule on his proposed disallowance of the CDP costs. It was his position that the Commission failed to comply with Section 23-2-421(a), which requires a

commission's decision to be in sufficient detail to enable a court to determine the controverted question presented by the proceeding.

To address this point, it is essential that we examine the manner in which the Attorney General presented his opposition to Staff's recommendation in regards to the audit trail and acceptance of the $13 million in expenses. To support his recommendation that the expenses be disallowed, the Attorney General relied on a Staff draft audit report addressing a 1991 test year rather than the 1993 test year that the Commission ordered be used and an internal Staff memorandum addressing the draft report. The Commission excluded the documents and Copeland's conclusions regarding the documents as not relevant to the issues presented in the Audit docket. As discussed later in this opinion, we find no error in the Commission's exclusion of the evidence. As a result of the exclusion, the Attorney General's recommendation was supported solely by Copeland's opinion that: "Since there is no audit trail to track these expenses to their originating source, they should be disallowed and excluded from SWBTA's cost of service." In Order No. 14, the Commission clearly found Copeland's opinions to be unreliable because of his lack of auditing credentials. There was no relevant supporting testimony or exhibit that required further discussion by the Commission.

In Order No. 15, the Commission stated that there was "no requirement that the Commission rule specifically on each and every proposal made by a party or provide each party with a line-by-line critique of its testimony." The Commission noted that the issue was Staff's audit report and whether certain affiliate charges allocated to SWBTA were appropriately charged to Arkansas. Also at issue, the Commission stated, was the Agreement filed by Staff and SWBTA. The Commission further stated: "These issues are fully addressed and resolved in Order No. 14. The Commission addressed the recommendations of the [Attorney General] as a whole and found the recommendations without merit." In Order No. 14, the Commission adopted Staff's recommendations on the $13 million adjustment and then discussed in some detail the proposed Agreement, including the Attorney General's objections to it, and the expected benefits.

We hold that the Commission gave a considered and adequate response to the evidence presented and the arguments advanced.

It is not required that an administrative agency make findings of fact upon all items of evidence or issues, nor even necessarily to answer each and every contention raised by the parties, but the findings should be sufficient to resolve the material issues, or those raised by the evidence which are relevant to the decision.

73A C.J.S. *Public Administrative Law and Procedure* § 144 (1983). We conclude that the findings made by the Commission are sufficient to inform the parties and this Court of the basis for the Commission's orders and indicate the reasoning by which the Commission reached its decision.

For the foregoing reasons, we affirm as to the Attorney General's second argument.

## III.

For his final argument, the Attorney General makes two separate points: (1) he contends that he was denied the opportunity to discover evidence and that Staff was allowed to determine the relevancy of the evidence he sought to discover; and (2) that the Commission refused to allow relevant evidence to be admitted or used for impeachment purposes.

 Before we address the merits of these arguments, we note that the Commission and SWBT contend that the Attorney General has failed to preserve these issues for appeal. Specifically, they claim that the Attorney General's notice of appeal failed to reference Order Nos. 5, 6, 11, and 12, as required by Arkansas Code Annotated § 23-2-423 (Supp. 1993), which provides that a party may obtain review of an order in this Court by filing a notice of appeal "stating the nature of the proceeding before the commission, identifying the order complained of and the reasons why the order is claimed to be unlawful, and praying that the order of the commission be modified, remanded, or set aside in whole or in part." They urge that strict compliance with the provisions of this statute is necessary before any order of the Commission may be reviewed by this Court. We hold that the Attorney General has appropriately preserved the above issues for appellate review. In his petition for rehearing of Order No. 14, the Attorney General raised the issue of the Commission's failure to allow him discovery, and this issue was addressed by the Commission in Order No. 15, denying the rehearing petition.

As to the merits, we note that the Audit docket was initiated by the Commission on May 24, 1994, in Order No. 1. In that order, the Commission recognized that Staff had been "in the process of" conducting an audit of Southwestern Bell Corporation (SBC) and that completion of the audit had been pending "too long." The Commission directed Staff to complete the St. Louis audit using a test year ending May 31, 1993. The Commission set a procedural schedule and ordered Staff to file the audit results by September 24, 1994. Prior to the filing of the audit report, the Attorney General had submitted to SWBT requests for data and requests for production of documents. The Attorney General sought, *inter alia*, to obtain SWBT's and SBC's long-range planning documents, budgets, and network transition plans. SWBT objected to these discovery requests, stating in part that most of the information requested had been provided to the Attorney General in the Stipulation docket, that the Attorney General failed to specify what type of plans or budgets he sought, and that the documents lacked relevance because they did not address affiliate transactions or allocation of costs which were the subject of the audit report. In Order No. 5, issued July 19, the Commission found the Attorney General's motion to compel discovery to be untimely and pointed out that the only pending matter in the docket was the Commission's direction to Staff to conduct an audit. The Commission stated:

> Until such time as Staff completes its audit and files its audit report there are no defined issues pending in this Docket. Therefore, it is difficult to understand why the [Attorney General] is conducting discovery at this time or how the [Attorney General] can definitively state what will or will not be relevant to the issues which may be developed as a result of the Staff's audit report.

In Order No. 6, the Commission denied the Attorney General's petition for rehearing but stated that the Attorney General could request additional time for discovery, if needed, after the audit report was filed.

The audit report was filed on September 20, 1994. In a pleading filed on October 20, SWBT objected individually to eleven data requests and eight document requests, filed by the Attorney General on October 12, 1994, contending that the information the Attorney General sought was beyond the scope of the audit and completely unrelated to any issue raised in Staff's audit:

SWBT objects to this Data Request seeking information beyond the scope of this Docket which involves only SWBT's affiliate transactions and corporate allocations. The Information Network Transition Plan ("INTP") is not relevant to those issues and contains no information concerning or relating to such issues. The INTP does not address the allocation of cost (i.e. expense) between SBC, and it is not relevant to the review or audit of affiliate transactions. The majority of this document discusses SWBT's strategic plans and goals, and it reveals SWBT's assessments of its technological deployment progress in relation to its goals for deployment....

In Order No. 11, the Commission found that, with the issues to be addressed clearly identified for the first time, the scope of the proceeding was established and limited to the specific issues addressed in the audit report. Consequently, the Commission found the Attorney General's motion to compel discovery to be ripe for resolution, but denied the motion, finding that the information sought was outside the scope of the docket. The Attorney General's motion for partial rehearing was denied in Order No. 12:

The Commission defined the preliminary scope of this Docket in Order No. 1 which directed the General Staff to conduct the "St. Louis Audit" using a test year ending May 31, 1993. The issues and the scope of this Docket were further defined and narrowed by the filing of General Staff's formal audit report on September 20, 1994, in compliance with Order No. 1. The Commission set the scope of the Docket and the Commission determined that the [Attorney General's] discovery exceeded that scope. "Control of the ... extent of discovery rests in the sound discretion of the Commission." Rule 13.02(a), Commission's Rules of Practice and Procedure.

As the General Staff stated in its Response: "The simple fact that the [Attorney General] wishes to address issues the other parties do not consider relevant does not mean that the Attorney General has been denied due process. The Commission is the appropriate body to determine the scope of issues in pending dockets, especially when those dockets were initiated by the Commission."

On appeal, the Attorney General contends that in limiting discovery the Commission failed to follow its own rules, improperly delegated its own function and responsibility, and deprived the Attorney General of his right to due process.

We find no merit to the Attorney General's assertion that the Commission "did not abide by Rule 13.04 of the Commission's Rules of Practice and Procedure, which provides that 'discovery may commence by any party on assignment of a docket number by the Secretary [of the Commission].' " Here, the Commission simply delayed discovery until the audit report was filed and the scope of the docket was set. The Attorney General was allowed to pursue discovery after the filing of the audit report and had the same opportunity to conduct discovery as any other party to the docket. The Attorney General exercised his right to discovery and obviously did not find it necessary to seek additional time to complete discovery. In addition, the Attorney General has failed to demonstrate that he suffered prejudice as a result of the Commission's delay of discovery.

The Attorney General also argues that the Commission erred by delegating to Staff the Commission's responsibility to determine the scope of the docket. He argues that giving one party to the proceeding the right to determine what is relevant, discoverable, and admissible violated his right as the representative of Arkansas ratepayers to be heard and present evidence in support of his position and in rebuttal to the other parties' positions. He argues:

> A fundamental requirement of due process in matters of public utility regulation is a full and fair hearing. *Arkansas Elec. Energy Consumers* v. *Arkansas Pub. Serv. Comm'n*, 35 Ark. App. 47, 64, 813 S.W.2d 263 (1991). A full and fair hearing requires "that all whose rights are involved have the opportunity to be heard, to submit evidence and testimony, to examine witnesses, and to present evidence or testimony in rebuttal to adverse positions." *Id.*, citing *Federal Trade Commission* v. *National Lead Co.*, 352 U.S. 419 (1957). Giving one party to the proceeding the right to determine what is relevant, discoverable and admissible violated the [Attorney General's] right as the representative of ratepayers to be heard and present evidence in support of its position and in rebuttal to the other parties' positions.

The Commission denied that the Attorney General did not receive a fair hearing but also defended its right to determine the scope of its dockets, especially one it initiated:

The Commission did not, as the [Attorney General] contends, delegate to a party the right to determine what is relevant, discoverable, and admissible. The Commission has broad investigatory authority. Ark. Code Ann. §§ 23-2-306 — 23-2-311 (1987). The [Attorney General] lacks this authority. The witnesses presenting testimony on behalf of Staff had auditing experience and expertise. The [Attorney General's] witness had neither. Just as this Court gives due regard to the expertise of the Commission, *Ark. Elec. Energy Consumers*, 35 Ark. App. at 71, 813 S.W. at 277, citing *Ark. Okla. Gas Corp.* v. *Ark. Pub. Serv. Comm'n.*, 27 Ark. App. 277, 282, 770 S.W.2d 180 (1989), the Commission can· give due regard to the expertise of Staff.

 The Attorney General acknowledges that the Commission has authority to conduct audits of jurisdictional utilities in accordance with Arkansas Code Annotated § 23-2-310 (1987), and it was the Commission's decision to define the parameters of the docket by what Staff included in its audit report. We hold that the Commission properly exercised its authority and discretion in defining the scope of the docket.

The Attorney General's final point is that the Commission abused its discretion by refusing to admit the following evidence or to allow it to be used for impeachment purposes: a Staff draft audit report addressing a 1991 test year, a memorandum related to the draft audit report prepared by a Staff member and addressed to another Staff member, and Attorney General witness Copeland's testimony regarding the draft audit report and the memorandum.

The excluded draft audit report stated in part that absent an adequate audit trail, "consideration should be given as to whether any SWBTA expenses received through the GHQ prorate process should be recovered through rates paid by Arkansas ratepayers." In the excluded memorandum, a Staff member had stated that "there are significant, serious areas of abuse and potential abuse by Southwestern Bell and its affiliates." The Attorney General sought to introduce these documents at the hearing to show that Staff had changed its position concerning the GHQ costs and lack of an audit

trail.

Staff objected to admitting the documents, pointing out that the report was not a final Staff product and had not been filed or presented to the Commission. Staff witness James discussed the draft audit report in her surrebuttal testimony as follows:

> First, it is obviously not a completed work product, as indicated by the designation of "draft". Second, the purpose of "Staff's Draft Audit" indicated on page ii indicates the "report is designed to provide a guide that will assist Staff, on a going forward basis, in assessing the operations of SWBT...." Third, the draft report covers a different test period, 1991. Some of SWBT's accounting procedures are different for the current test year.

She further stated: "The memorandum in question is simply one person's assessment of a *draft* audit report." (Emphasis in original.)

The Commission granted Staff's motion, finding that the two documents were not relevant to the proceedings before the Commission. The Commission then struck that portion of Attorney General witness Copeland's testimony in which he pointed out that, in the excluded audit report, Staff had considered the possibility of disallowing the expenses and that a Staff member had stated in the memorandum:

> It would appear that the Commission is "at the mercy" of [SWBT] with regard to these GHQ costs unless the Commission takes the position that: The burden of proof regarding these costs rests clearly on the shoulders of [SWBT], and, absent definitive proof regarding the appropriateness of these costs, none will be allowed for ratemaking in Arkansas.

On appeal, the Attorney General argues that the material should have been admitted because the material demonstrates that Staff had altered its positions on whether the costs should be recovered from Arkansas ratepayers and the proper burden of proof concerning the lack of an audit trail. The Attorney General contends that the Commission's failure to allow this evidence violated his right to due process of law because he was unable to use it to impeach Staff witnesses or in support of his position.

In Order No. 15, the Commission addressed this argument of the Attorney General:

The [Attorney General] now contends that it should have been allowed to use the exhibits to impeach certain Staff witnesses. This is a new allegation by the [Attorney General] which was not raised during the hearing. The [Attorney General] cross-examined the Staff witnesses in the hearing but the [Attorney General] never attempted to use the stricken exhibits or any portion thereof during its cross-examination. The appropriate time to have raised this issue would have been during the hearing if the [Attorney General] had sought to use the stricken exhibits for impeachment purposes. It did not and it is too late to raise the issue after the hearing is concluded and the order entered.

We are not persuaded that the Commission abused its discretion in excluding the report and memorandum or that the Attorney General's rights were violated. The testimony clearly showed that the audit report addressed a test year not in issue in the proceedings; that certain accounting changes had occurred since the report; that the report was a draft report and was never adopted by Staff as its position; and that the memorandum addressing the report simply was one Staff member's opinion of the draft report. Furthermore, the Attorney General never presented the burden-of-proof issue to the Commission, nor did he attempt to impeach the witnesses with the material. These issues and arguments were not timely made and are not preserved for appeal. *See In Re Estate of Spears*, 314 Ark. 54, 61-62, 858 S.W.2d 93 (1993). In addition, the Attorney General's cross-examination of Staff witnesses was not limited, and he elicited testimony from Staff that it previously had considered recommending a disallowance of the costs.

 The Attorney General also argues that the Commission erred in striking the portion of Copeland's testimony pertaining to the excluded Staff draft audit report and Staff memorandum. He contends that Copeland's testimony should have been allowed even if the documents were not admissible. In making this argument, he relies on Rule 703 of the Arkansas Rules of Evidence, which provides:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts

or data need not be admissible in evidence.

We reject this argument because we have sustained the Commission's finding that the documents were not relevant to the issue in the proceedings. In addition, the Attorney General failed to demonstrate that a draft audit report based on a different test year and an internal Staff memorandum were "of a type reasonably relied upon by experts in the particular field in forming opinions or references upon the subject," and the Attorney General failed to qualify his witness, an economist, as an expert on the sufficiency of audit trails.

For the reasons stated, we affirm the Commission's orders relating to discovery and the admissibility of evidence.

We have examined the arguments made in Docket No. 94-169-U, and, since we find no error on the points raised on appeal, we affirm.

Affirmed.

ROBBINS, PITTMAN, and STROUD, JJ., agree.

MAYFIELD and NEAL, JJ., dissent.

MELVIN MAYFIELD, Judge, dissenting. I would reverse the Commission's allowance of the $13 million in CDP expense charged to SWBTA by GHQ because SWBTA failed to demonstrate that the charges were just and reasonable as required by Ark. Code Ann. § 23-4-104 (1987). In the audit report, Staff stated that its "primary objective in evaluating the GHQ prorate process was to determine the nature of the costs flowing to SWBTA from GHQ to gain assurance that these costs were appropriate and necessary to provide utility service." Staff admitted in the report that it could not trace any of the CDP charges to the originating source documents and that it was impossible to determine the amount of the CDP charges SWBTA actually received:

> [D]ue to the lack of totals by source code in the FD98-Prorate Audit Trail Report; and as demonstrated by Staff's previous example of the manual calculation necessary to ascertain a total; and due to time constraints, Staff could not verify the accuracy of the information supplied by SWBT. In addition, Staff requested copies of all internal and external audit reports which included a review of the CDP Process.

> [SWBT's] response to Staff ... states "A review of our audit-
> ing reports (1988 through 1994) indicates that no audits were
> performed on the Costs Distribution Chargeback Process.

Notwithstanding the uncontroverted fact that Staff could not trace the CDP costs to their originating sources, the Commission in Order No. 14 failed to address the issue of whether these expenses should be allowed and again refused to do so in Order No. 15.

In affirming this point, the majority relies on Staff's statement in the audit report "that the alternative steps taken were adequate to assess the appropriateness of these expenses for ratemaking pur-poses," the testimony of Staff witness Marie James, and the testi-mony of SWBT witness Steve Usselmann. Although the report and James and Usselmann in their testimony conclude that the charges are reasonable, no facts were testified to that demonstrate the rea-sonableness of the charges for rate-making purposes. Usselmann testified that "auditing around the system" provides assurance on the reliability of the process and is an acceptable method of audit-ing. He offered no evidence, however, to support his opinion. Apparently, the Commission accepted the conclusions of these witnesses without any supporting evidence because they have "accounting credentials"; whereas, the Attorney General's witness, who challenged the lack of evidence, was a mere economist who specializes in energy and utility economics.

The majority states that the concerns of the Attorney General regarding the lack of an audit trail were addressed in the Agreement that was approved by the Commission in Order Nos. 14 and 15. That Agreement, however, which concerns steps to be taken in the future to ensure the proper verification of such expenses, does not abrogate this Court's duty to determine whether the Commission's findings are supported by substantial evidence and whether the Commission has regularly pursued its authority. *Bryant* v. *Arkansas Pub. Serv. Comm'n*, 50 Ark. App. 213, 219, 907 S.W.2d 140 (1995).

The Commission has wide discretion in choosing its approach to rate regulation, and it is not the function of the appellate court to advise the Commission as to how to make its findings or exercise its discretion. *See Bryant* v. *Arkansas Pub. Serv. Comm'n*, 46 Ark. App. 88, 101, 877 S.W.2d 594 (1994). Nevertheless, on review this Court must determine whether the findings of the Commission are supported by substantial evidence, not whether its conclusions are

supported by substantial evidence. *See Bryant* v. *Arkansas Pub. Serv. Comm'n*, 45 Ark. App. 56, 63, 871 S.W.2d 414 (1994).

Here, the Commission made no finding that the CDP costs were just and reasonable. Nor is there any evidence to support such a finding. Accordingly, I would reverse.

NEAL, J., joins in this dissent.